**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE,
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **RANDI MARIE BRUCE** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:24-cv-000875** |
| | ) | |
| **ADAMS AND REESE, LLP** | ) | |
| **Defendant.** | ) | **JURY DEMAND.** |
| | ) | |

---

## FIRST AMENDED COMPLAINT

---

Plaintiff Randi Bruce ("Ms. Bruce"), by and through undersigned counsel, brings this Complaint against Defendant Adams and Reese, LLP ("Defendant"), and alleges as follows:

### I.  INTRODUCTION

1.      Ms. Bruce brings this action against Defendants for violations of her rights protected by Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. §12101 et seq., as amended by the Americans with Disabilities Act Amendments Act of 2008 ("ADA"), Title I and Title VII of the Civil Rights Act of 1991, 42 U.S.C §1981a, the Tennessee Human Rights Act, T.C.A. § 4-21-101 et. seq., and Tennessee common law.

2.      Ms. Bruce seeks to correct unlawful employment practices on the basis of her disability and to obtain redress for damages she suffered as a result of the Defendant's unlawful actions. As stated with particularity below, Ms. Bruce alleges that Defendants failed to engage in an ongoing interactive process and to provide a modified reasonable accommodation to her, a qualified individual with a disability, during her employment, and discharged her because of her disability and in retaliation for her protected activities. Additionally, Ms. Bruce is a female who was repeatedly subjected to sexual harassment by a supervising attorney.

1

## II.    JURISDICTION & VENUE

3.    This Court has original jurisdiction of this action pursuant to 28 U.S.C. §1331.

4.    This Court also has supplemental jurisdiction over Ms. Bruce's state law claim pursuant to 28 U.S.C. § 1367 because it is so related to the federal claims that they form part of the same case or controversy.

5.    The claims asserted in this action arose in Davidson County, Nashville, Tennessee; therefore, the proper venue for this action lies within the Middle District of Tennessee pursuant to 28 U.S.C. § 1391.

## III.    THE PARTIES

6.    Plaintiff Randi Bruce is an adult resident of Smyrna, Rutherford County, Tennessee, and a citizen of the United States.

7.    At all relevant times, Ms. Bruce was an "employee" of Defendant, who operates a law firm. Defendant is an "employer" within the meaning of the ADA, 42 U.S.C. § 12111(2).

8.    Defendant Adams and Reese LLP is a Louisiana limited liability partnership.

9.    Defendant may be served with process through its registered agent, Edward Playfair, at its principal place of business located at 1600 West End Ave., Suite 1400, Nashville, Tennessee 37203.

10.    Defendant employs more than 500 employees.

## IV.    ADMINISTRATIVE PREREQUISITES

11.    Ms. Bruce has fulfilled all conditions precedent to the institution of this action under Title I of the ADA and Title VII.

12.    Ms. Bruce timely filed her Charge of Discrimination with the EEOC. (See Exhibit A to original Complaint.)

13.    Ms. Bruce timely filed this Complaint within ninety days of the receipt of a Notice of Right

to Sue issued by the EEOC.  (See Exhibit B to original Complaint.)

## V.     RELEVANT FACTS

14.     At all relevant times, Ms. Bruce was a paralegal at Defendant's firm as a member of the firm's Alcohol and Hospitality Team (the "Liquor Group").

### A.     History of Ms. Bruce's Disabilities

15.     Ms. Bruce spent her entire childhood being emotionally, physically, mentally, and sexually abused.

16.     The abuse began when Ms. Bruce was a toddler and continued at the hands of her own family for thirteen years until Ms. Bruce was removed from the home and placed in foster care.

17.     Ms. Bruce experienced additional abuse over the next five years in her foster homes.

18.     In 2017, Ms. Bruce was diagnosed with Post Traumatic Stress Disorder with Panic Attacks, Attention Deficit Hyperactivity Disorder combined presentation, Social Phobia, Persistent Depressive Disorder with Anxious Distress, Sleep Apnea, Insomnia, periodic limb movement disorder and restless leg syndrome.

19.     Despite the eighteen years of chronic childhood trauma and the multiple complications she was diagnosed with as a result, Ms. Bruce made great strides in recovering, but she had not been able to overcome all of these obstacles by the time she became employed at Adams and Reese.

20.     Ms. Bruce still struggled with posttraumatic stress disorder, attention-deficit/hyperactivity disorder, persistent depressive disorder with anxious distress, and insomnia which significantly impaired her daily functioning when left untreated.

21.     Each diagnosis alone is sufficient for Ms. Bruce to qualify for a reasonable accommodation under the Americans with Disabilities Act.

### B.     Ms. Bruce's History with the Liquor Group.

22.     The Liquor Group, including Ms. Bruce, was recruited by Defendant in May of 2022 from

a previous law firm, Waller Lansden Dortch & Davis LLP ("Waller").

23.     Ms. Bruce initially served as the Liquor Group's legal assistant at Waller from July 2019 to April 2020, and again from April 2021 to March 2022. (Ms. Bruce was part of a large layoff by Waller as a response to the COVID-19 epidemic but was brought back on and restored to her position on request of the Liquor Group.)

24.     Mr. Cheek and Mr. Pinson regularly gave Ms. Bruce financial gifts or bonuses to show their appreciation for her.

25.     Mr. Pinson gave Ms. Bruce a $1,000 bonus from his personal finances on December 6, 2019.

26.     Mr. Cheek gave Ms. Bruce a $1,500 bonus from his personal finances on January 16, 2020.

27.     Mr. Cheek gave Ms. Bruce a $2,500 bonus from his personal finances on March 13, 2020.

28.     Mr. Pinson gave Ms. Bruce a $500 bonus from his personal finances on January 21, 2022.

29.     Along with the financial bonus, Mr. Pinson wrote Ms. Bruce a Thank-You card that said: "Randi – I truly appreciate everything you have done, both for me and for the AB team.  You are truly loved and a part of the AB team family.  I do not know what I would do without you.  Thank you, thank you, thank you.  Yours Always, Rob."

30.     Mr. Cheek gave Ms. Bruce $1,000 cash for her birthday on February 3, 2022.

31.     Ms. Bruce was promoted from the Liquor Group's legal assistant to their paralegal at Waller in March of 2022.

32.     When Defendant recruited the Liquor Group from Waller in May of 2022, Ms. Bruce was personally recruited as well.

33.     Mr. Pinson gave Ms. Bruce a $750 bonus from his personal finances on March 27, 2023.

34.     Along with the financial bonus, Mr. Pinson wrote Ms. Bruce a Thank-You card that said:

"Randi – Thank you for all your help this past year. I know it has been tough, but you are an incredibly strong person and I want you to know that you are loved and that it will get better. I really want you on this team for as long as you can tolerate us. You are a valued member of this team, and you will be a great lawyer one day soon. Sincerely, Rob."

## C. The Liquor Group's Awareness of Ms. Bruce's Disabilities

35. Mr. Pinson became aware of Ms. Bruce's panic attacks on or before August 16, 2019.

36. Mr. Pinson became aware of Ms. Bruce's difficulty sleeping and waking up on time on or before December 4, 2019.

37. Mr. Cheek became aware of Ms. Bruce's difficulty sleeping and waking up on time on or before September 14, 2021.

38. Mr. Cheek became aware of Ms. Bruce's need to take sedatives to sleep on or before September 19, 2021.

39. On September 19, 2021, Mr. Cheek purchased a "Sonic Boom" alarm clock for Ms. Bruce that was advertised to be "extra loud" and included both strobe lights and a vibrating feature because of Ms. Bruce's difficulty waking up on time.

40. Mr. Cheek became aware of Ms. Bruce's Adderall prescription on or before February 3, 2022.

41. Ms. Bruce's work schedule with the Liquor Group at Waller was a "Flex Schedule" allowing her the flexibility of what time she clocked in and out.

42. Ms. Bruce's Flex Schedule did not require Ms. Bruce to clock in at a specific time but required her to communicate with her team about when she would be coming into the office.

## D. Ms. Bruce's History with Defendant

43. Ms. Bruce interviewed with Defendant on April 26, 2022.

44. Mr. Pinson and Office Manager Brooke Ponder ("Ms. Ponder") were both present during

this interview.

45.     During the interview, it was disclosed that Ms. Bruce worked a flexible schedule, although no specifics were discussed.

46.     Ms. Bruce's first day with Defendant was on May 16, 2022.

47.     On May 16, 2022, Ms. Bruce and the other paralegal on the team were asked to fill out new hire paperwork in a conference room with Ms. Ponder.

48.     While in the conference room with Ms. Ponder and the other paralegal, Ms. Ponder asked Ms. Bruce what her start time would be.

49.     Ms. Bruce responded to Ms. Ponder's question with a variation of "it depends" and stated that she struggled with mornings and worked a flexible schedule.

50.     Ms. Bruce further explained that she had previously had a goal for a start time and would text her team if she deviated from that start time.

51.     Ms. Ponder asked for an estimate to include in the paperwork, and Ms. Bruce stated 9:00 a.m. as an estimate.

52.     Ms. Ponder did not further inquire into what Ms. Bruce meant by claiming she struggled with mornings.

53.     Ms. Ponder did not inform Ms. Bruce that her response violated any company policy or would not be allowed.

54.     Ms. Ponder did not inform Ms. Bruce that the firm did not or would not accommodate her existing flexible schedule.

55.     Ms. Bruce continued working her previous flexible schedule without interference from May 16, 2022, until she was informed that the firm considered her communication to be inadequate on October 2, 2022.

56.    Ms. Bruce and Ms. Ponder met the following week to discuss a fixed start time of 9:00 a.m. on Mondays, Wednesdays, and Thursdays and 10:00 a.m. on Tuesdays and Fridays.

57.    Ms. Ponder became aware of Ms. Bruce's difficulty sleeping and waking up on time on or before November 2, 2022.

58.    On November 8, 2022, Ms. Ponder presented Ms. Bruce with a performance memo about her tardiness.

59.    During this meeting, Ms. Ponder emphasized the main problem as being with communication with her because while Ms. Bruce was communicating with team members, she was not communicating directly with Ms. Ponder on days she would be late.

60.    Following the November 8, 2022, Performance Memo, Ms. Bruce began including Ms. Ponder in her communications when she was running late.

61.    Ms. Ponder became aware that Ms. Bruce was seeing a psychiatrist on or before November 23, 2022.

### E.    The March 24, 2023, Meeting

62.    Ms. Bruce began experiencing a significantly delayed response when taking her sedative on or around March 13, 2023, causing her to still be sedated when her alarms were scheduled to go off the following morning.

63.    This side effect resulted in her late arrival on nine days over the next two weeks.

64.    Ms. Bruce reached out to either Ms. Ponder, Mr. Cheek, or both, on three of these days.

65.    On March 24, 2023, Ms. Bruce was called into an unscheduled meeting with Ms. Ponder, Mr. Cheek, and Mr. Pinson.

66.    Before this meeting, Ms. Bruce was not questioned about her tardiness over the previous two weeks.

67.    When Ms. Bruce walked into the conference room, she was surprised to see the three

7

individuals seated at a conference table and was instructed to shut the door and sit down.

68.     At first, the tone was friendly and Ms. Ponder followed up with Ms. Bruce about why Ms. Bruce had stopped by her office earlier that day.

69.     Ms. Bruce explained she wanted to offer Ms. Ponder free tickets to a musical that weekend since she knew Ms. Ponder was a fan of musicals.

70.     After discussing weekend plans, Ms. Ponder's tone changed dramatically.

71.     Ms. Ponder informed Ms. Bruce that "they" wanted to talk to her about her "excessive" tardiness and failure to communicate over the previous eight days.

72.     Ms. Ponder told Ms. Bruce that "they" had discussed her termination.

73.     Ms. Bruce was provided with a memo stating her behavior was a continued violation of the "corrective action plan" established in November.

74.     Ms. Bruce was informed that her violation of the "corrective action plan" was enough for the firm to terminate her immediately.

75.     Ms. Bruce was informed that if she was late to work again, she would be terminated.

76.     Ms. Bruce was asked to sign a memorandum.

77.     Ms. Ponder stated, multiple times, that Ms. Bruce deserved to be fired.

78.     Ms. Bruce attempted to explain why she had been late over the last two weeks.

79.     Ms. Bruce asked what options there were to temporarily modify her schedule because of what she was experiencing.

80.     Ms. Ponder told Ms. Bruce the firm had already been flexible enough.

81.     Ms. Ponder, appearing agitated that Ms. Bruce was asking for accommodation, began berating Ms. Bruce.

        A.      Ms. Ponder told Ms. Bruce that she was "clearly falling back into bad habits."

B.  Ms. Ponder informed Ms. Bruce that "nobody else has this problem."

C.  Ms. Ponder told Ms. Bruce that people in the office were asking how they could get a "Randi Schedule."

82.  In response to Ms. Ponder's aggressive reaction, Ms. Bruce began having a panic attack.

83.  The following symptoms of Ms. Bruce's panic attack gave Ms. Ponder, Mr. Cheek, and Mr. Pinson notice that she was in obvious distress:

A.  Ms. Bruce was sobbing hysterically.

B.  Ms. Bruce was hyperventilating.

C.  Ms. Bruce was choking and gasping for air.

D.  Ms. Bruce was shaking uncontrollably.

E.  Ms. Bruce's nose was bleeding.

84.  In response, Mr. Pinson grabbed a box of tissues and pulled the conference room's trashcan over to where Ms. Bruce was seated.

85.  Ms. Ponder, however, continued her verbal attacks against Ms. Bruce.

86.  Ms. Bruce continued to try and explain the circumstances to Ms. Ponder, but her ongoing panic attack made it increasingly difficult for Ms. Bruce to effectively communicate.

87.  Ms. Bruce was able to verbalize to Ms. Ponder, Mr. Cheek, and Mr. Pinson multiple times that she was doing the best she could and asked the three individuals to help her.

88.  Once Ms. Ponder was done speaking, she opened the conversation up to Mr. Cheek and Mr. Pinson.

89.  Both Mr. Cheek and Mr. Pinson informed Ms. Ponder that Ms. Bruce's work product had been "excellent", and Ms. Bruce was continuously improving in terms of skill and enthusiasm the longer she worked in her position on the team.

9

90.     Mr. Cheek and Mr. Pinson also pointed out that Ms. Bruce had never missed a deadline nor had any of their clients been negatively impacted by her punctuality.

91.     Ms. Bruce once again asked Ms. Ponder what her options were to move forward.

92.     Ms. Ponder told Ms. Bruce that Ms. Bruce's only option was to sign the memo assuring the firm she would not be late again.

93.     Ms. Bruce tried to explain that she could not make this guarantee and did not want to sign a document promising to uphold an obligation she was not sure she could fulfill.

94.     Because Ms. Bruce was scheduled to take the Multistate Professional Responsibility Exam at the beginning of the following week, Ms. Ponder told Ms. Bruce she had until the following Friday, March 31st, to decide if she was "willing" to sign the memo.

95.     If Ms. Bruce was not "willing" to sign the memo, Ms. Ponder informed her that she would be terminated.

96.     Ms. Ponder then told Ms. Bruce to take a few minutes to compose herself before Ms. Bruce needed to return to her office to finish out the workday.

97.     Ms. Ponder, Mr. Cheek, and Mr. Pinson got up to leave the conference room, but Mr. Cheek requested the others give him a moment to speak with Ms. Bruce privately.

98.     Mr. Cheek apologized to Ms. Bruce for what she had been forced to endure during the meeting.

99.     Mr. Cheek encouraged Ms. Bruce to request medical leave for the issues she had attempted to raise during the meeting, or alternatively to request an accommodation for time to work with her doctor towards a solution.

100.    Mr. Cheek then hugged Ms. Bruce and left her in the conference room.

101.    Ms. Bruce remained in the conference room alone afterward in an attempt to calm down

from her panic attack.

102.    Ms. Bruce's symptoms continued in waves.

103.    Once Ms. Bruce believed she was "composed," she walked back to her office with her face pointed to the floor to avoid making eye contact with other employees.

104.    Ms. Bruce passed by one co-worker and attempted a smile but was confused by the look on his face in response.

105.    Once Ms. Bruce got back to her office, she looked in the mirror and understood the confusion on her co-worker's face: her face was swollen from the crying, looked like it was covered in hives, streaked with makeup, and smeared with blood from her nosebleed.

106.    Ms. Bruce was so humiliated and afraid of anyone else seeing her in that condition that she stayed in her office until almost 7:30 p.m. when she was confident almost everyone else in the office would be gone for the weekend.

### F.    March 25, 2023 – March 31, 2023

107.    Ms. Bruce spent the weekend after March 24th recovering from the physical and emotional aftermath of the panic attack she experienced.

108.    However, Ms. Bruce became more overwhelmed with anxiety and panic the closer Monday morning got.

109.    Ms. Bruce was terrified of having to walk back into the office and face her co-workers.

110.    On Sunday evening, after realizing she may run into Ms. Ponder in the hallways Monday morning, Ms. Bruce experienced another panic attack.

111.    After another panic attack early Monday morning, Ms. Bruce became concerned that she would face another humiliating altercation at work if she went into the office that day.

112.    Afraid of how another experience like Friday's would impact her ability to perform on the Multistate Professional Responsibility Exam she had scheduled first thing Tuesday morning, Ms.

Bruce emailed her team informing them she was taking a PTO day.

113.    Ms. Bruce had previously scheduled Tuesday, March 28th off for the MPRE.

114.    After taking the Exam Tuesday morning, Ms. Bruce spent the day trying to prepare for her return to work Wednesday.

**(1)      Wednesday, March 29, 2023.**

115.    Ms. Bruce was so anxious about going back to the office that she could not fall asleep until after 3:00 a.m.

116.    Upon returning to the office on Wednesday, Ms. Bruce found an envelope containing a card and check for $750.00 dated March 27, 2023, from Mr. Pinson sitting on her chair.

117.    Mr. Pinson wrote Ms. Bruce a Thank-You card that said: "Randi – Thank you for all your help this past year.  I know it has been tough, but you are an incredibly strong person and I want you to know that you are loved and that it will get better.  I really want you on this team for as long as you can tolerate us.  You are a valued member of this team, and you will be a great lawyer one day soon.  Sincerely, Rob."

118.    The kind gesture from Mr. Pinson encouraged Ms. Bruce to draft an email to Ms. Ponder and to make sure Ms. Ponder knew she was requesting reasonable accommodation.

119.    Around 4:00 p.m. on Wednesday, before Ms. Bruce could finish the email, Ms. Ponder and Mr. Pinson stopped by Ms. Bruce's office.

120.    Ms. Ponder asked how Ms. Bruce was doing.

121.    Ms. Bruce responded with an apology for her reaction during the meeting on Friday.

122.    Ms. Bruce explained she had experienced a panic attack, and further elaborated on her struggles with PTSD and sleep disorders stemming from the PTSD.

123.    Ms. Bruce informed Ms. Ponder that her previous tardiness had been caused by a delayed response to her sedative.

124. Ms. Bruce asked Ms. Ponder if they could discuss potential accommodations that would allow her the time to discuss the side effects of the medication with her doctor so they could come up with a plan without Ms. Bruce having to fear facing immediate termination.

125. Ms. Ponder told Ms. Bruce no, they could not discuss any accommodations.

126. Ms. Ponder told Ms. Bruce it did not matter what her "problems" were or what "excuses" she used, her only options were to sign the memo or face termination.

127. Ms. Ponder requested a response from Ms. Bruce right then.

128. Ms. Bruce reminded Ms. Ponder that they had agreed to give Ms. Bruce until Friday, March 30th, to make her decision.

129. Ms. Ponder became visibly angry at Ms. Bruce's response and demanded Ms. Bruce provide them with an answer by 10:00 a.m. on Friday.

130. At that exact moment, Mr. Cheek, who was out of town, called Ms. Bruce's office phone.

131. Ms. Ponder stormed out of Ms. Bruce's office.

132. Ms. Bruce answered her phone by thanking Mr. Cheek for calling at that moment.

133. Ms. Bruce experienced another panic attack following the altercation with Ms. Ponder.

134. Ms. Bruce's panic attack resulted in uncontrollable shaking for over four hours.

135. Ms. Bruce could not stop panicking or physically shaking even after she had left the office or while she was sitting in her law school class.

136. Ms. Bruce could not calm down and required an emergency call with her psychiatrist at 8:15 p.m.

137. In March 2023, The Defendant's Employer Handbook contained instructions on responding to harassment and discrimination:

A. If a non-attorney believed they were being discriminated against or harassed, they were to make a report to either the firm's Human Resources Director (Ms. Soileau), the Office Manager (Ms. Ponder), the Partner-in-Charge (Edward Playfair), or the Managing Partner (Gif Thornton).

B. If an employee with a disability needed a reasonable accommodation, they were to make a request to the firm's Human Resources Director (Ms. Soileau).

138. Ms. Bruce knew she had a limited amount of time to make this report before Ms. Ponder expected her to decide if she was "willing" to sign the memo, so to avoid any delay, Ms. Bruce chose to format the report as a letter addressed to Ms. Soileau but to copy each of the parties she could report to on the report, as well as Mr. Cheek and Mr. Pinson.

### (2) Thursday, March 30, 2023.

139. Ms. Bruce worked on drafting her letter/report all night on Wednesday the 29th and for the majority of Thursday, March 30th.

140. Ms. Bruce knew that by sending this letter, she would be creating a permanent record in her employment file describing all of the traumatic experiences she had worked so hard to hide.

141. Even worse, Ms. Bruce understood that she was about to tell the individuals who would be responsible for deciding whether or not she had a future as an attorney at this firm after law school that she had a disability.

142. Ms. Bruce also knew that once she sent this letter, the way her superiors viewed her could forever change from the employee who worked harder than the rest to a victim who used her past as an excuse.

143. Ms. Bruce chose to chance those repercussions and submitted the letter/report at 5:45 p.m.

(See Exhibit B.)

144. Ms. Bruce was too anxious and sleep-deprived to attend class after work.

145. Around 8:45 p.m., Ms. Ponder contacted Ms. Bruce's co-workers and informed them that they had been approved to work from home the following day.

146. At 9:10 p.m., Ms. Soileau responded to Ms. Bruce's email confirming receipt of the letter and that Ms. Soileau would review and follow up with Ms. Bruce.

147. At 10:36 p.m., Mr. Thornton responded to everyone included in Ms. Bruce's email (minus Ms. Bruce) informing them that the firm's Labor and Employment attorney was engaged with the Human Resources Director on the issue and until they had been advised on the next steps, everyone should refrain from any communications that would complicate their doing their jobs.

148. Ms. Bruce received no response to her report/letter from anyone included in the email except Ms. Soileau.

149. After learning her teammates had been encouraged to work from home the next day, Ms. Bruce was so convinced she was going to be terminated when she got to the office on Friday morning that she loaded her Jeep with boxes so she could pack up her office.

**(3)** **Friday, March 31, 2023.**

150. Ms. Bruce did not hear anything in response to her report/letter until 2:30 p.m. when Ms. Soileau called her.

151. Ms. Bruce told Ms. Soileau that if signing the memo and agreeing to be on time was all it took to solve this problem, she would, but Ms. Bruce could not sign the memo in good faith and make a promise she did not know was possible for her to keep.

152. Ms. Bruce told Ms. Soileau that she was under the impression she would be fired today if she did not sign the memo.

153. Ms. Soileau told Ms. Bruce that was a miscommunication.

15

154.    Ms. Soileau informed Ms. Bruce that the memo was only intended to point out the work-related areas that still needed improvement.

155.    Ms. Soileau told Ms. Bruce that "immediate improvement" did not mean it needed to be improved five minutes from now, but that person was going to do their best.

156.    Ms. Soileau said she wanted to start with Ms. Bruce as she began evaluating what options would work for all the involved parties to ensure the essential work was being performed.

157.    Ms. Bruce told Ms. Soileau that she was willing to talk with her doctor about switching medication, but that was a process and could not happen instantly.

158.    Ms. Soileau encouraged Ms. Bruce to consult her doctor and pointed out she was not asking Ms. Bruce to change medications, or even asking Ms. Bruce not to oversleep.

159.    Ms. Soileau asked Ms. Bruce if Ms. Bruce was merely asking for more time to find a solution.

160.    Ms. Bruce confirmed that all she was asking for was additional time to find a solution without the fear of facing immediate termination.

161.    Ms. Soileau said she would follow up with Ms. Bruce by the end of the day with the firm's decision on the extended time period to figure out the next steps, potentially getting Ms. Bruce's doctor involved, or just working together to come up with a solution.

162.    Ms. Soileau called Ms. Bruce back around 4:30 p.m. requesting Ms. Bruce continue considering potential solutions over the weekend and they would touch base the following Monday.

163.    Ms. Bruce offered to provide Ms. Soileau with evaluation reports or medical records verifying the conditions Ms. Bruce had reported.

164.    Ms. Soileau said she did not need those records.

165.    Ms. Soileau told Ms. Bruce that she would provide Ms. Bruce with a guideline to review with her doctor that could assist the firm in determining the best accommodation to implement.

166.    Ms. Bruce ended the workday somewhat relieved, believing she and the firm were on the same team and working towards the same end goal.

### G.    April 3, 2023 – April 6, 2023

**(1)    Monday, April 3, 2023.**

167.    Ms. Bruce waited by her office phone until she risked being late for class, but Ms. Soileau did not reach out to Ms. Bruce to touch base on the next steps.

168.    When Ms. Bruce walked out of her office and to the elevator, she encountered Mr. Pinson standing with Ms. Ponder next to the elevators talking at a social event hosted by the firm.

169.    Ms. Bruce could not delay her departure any longer or else she would be late for class.

170.    When Ms. Bruce opened the glass doors in front of the elevators, she heard Ms. Ponder speaking to Mr. Pinson.

171.    Ms. Bruce heard Ms. Ponder saying something along the lines of "I haven't talked about it" when she opened the doors.

172.    Ms. Ponder stopped speaking in midsentence when she saw Ms. Bruce approaching, physically turned her body in the other direction, and walked away, refusing to acknowledge her in front of a lobby filled with staff members, clients, and attorneys.

173.    Ms. Bruce realized Ms. Ponder was not going to acknowledge anything said in her letter or attempt to move forward professionally.

**(2)    Tuesday, April 4, 2023.**

174.    Ms. Bruce was suffering from severe anxiety when she went back to the office after her experience with Ms. Ponder the previous day and planned to discuss how to move forward when she heard from Ms. Soileau.

175. Ms. Soileau did not reach out to Ms. Bruce to touch base on the next steps.

176. Nobody communicated with Ms. Bruce about the next steps or whether her job was safe.

**(3)    Wednesday, April 5, 2023.**

177. Ms. Soileau did not reach out to Ms. Bruce to touch base on the next steps.

178. Nobody communicated with Ms. Bruce about the next steps or whether her job was safe.

179. Ms. Bruce was left in the dark about what she was supposed to be doing and how to ensure she would not be fired.

180. The silence Ms. Bruce received in response to her report caused her to experience another panic attack.

181. Ms. Bruce reached out to Mr. Cheek and requested he put a meeting on his calendar to speak with her the next day before everyone was off for the holiday weekend.

**(4)    Thursday, April 6, 2023.**

182. Even though he had served as her mentor and friend since 2019, Ms. Bruce had not spoken with Mr. Cheek about anything besides specific project details since she submitted her report/letter.

183. Mr. Cheek met with Ms. Bruce at 10:00 a.m.

184. During this meeting, Mr. Cheek confirmed Ms. Bruce was given the ultimatum to either sign the memo or face termination and told Ms. Bruce that was why he encouraged her to request medical accommodation.

185. Mr. Cheek was surprised when Ms. Bruce told him Ms. Soileau explained the ultimatum was a miscommunication.

186. Mr. Cheek was not aware that Ms. Ponder and Mr. Pinson were going to stop by Ms. Bruce's office on March 29, 2023, or that Ms. Ponder would deny Ms. Bruce's request for a reasonable accommodation.

187. Mr. Cheek told Ms. Bruce he would be supportive of any accommodation the firm

approved for her.

188.    Ms. Bruce asked Mr. Cheek if she was performing well at her job, and he confirmed she was and that he had made sure to point this out to the firm.

189.    Mr. Cheek apologized to Ms. Bruce for the terrible situation she was in.

190.    Mr. Cheek told Ms. Bruce he was thankful that despite the terrible situation, she was not only coming to work but working really hard.

191.    Ms. Bruce informed Mr. Cheek that she had been in a constant state of anxiety for the last week and was worried about how it was going to impact her performance on her law school final exams.

192.    Mr. Cheek encouraged Ms. Bruce to follow up with Ms. Soileau.

193.    Ms. Bruce took Mr. Cheek's advice and followed up with Ms. Soileau, who claimed to still be drafting the medical questionnaire.

194.    Ms. Bruce sent Ms. Soileau her medical evaluation and monthly invoices showing the conditions she had been treated for over the previous nine months to help assist Ms. Soileau in drafting the questionnaire.

### H.    April 10, 2023 – April 15, 2023

**(1)    Monday, April 10, 2023.**

195.    At 4:50 p.m., Ms. Soileau followed up with Ms. Bruce about the next steps.

196.    Ms. Soileau requested Ms. Bruce provide the following attachments to her doctor and have her doctor return the forms directly to Ms. Soileau for review and evaluation:

   A.    A letter to the physician that read:

   Our employee, Randi Bruce, is a Paralegal who supports two
   attorneys who require consistency, dependability and predictability
   from their employees in providing service to their clients. Ms. Bruce
   was approved a later arrival schedule of 9:00 a.m. Mondays,

Wednesdays and Thursdays, and 10:00 a.m. on Tuesdays and Fridays to accommodate her request to attend law school classes.

As outlined in our Handbook (policy attached), employees are required to work their approved work schedules and call their supervisors in advance if they will be late to work. Ms. Bruce has been consistently late to work and on occasion, has failed to call in and report her lateness to her attorneys or the office manager. Ms. Bruce was counseled and disciplined for the excessive tardiness, most recently at the end of March 2023. In connection with the disciplinary session, Ms. Bruce said that she has been experiencing side effects from a sedative she takes for sleep which she contributes to the cause of her frequent tardiness to work. Timecards from the period of November 2, 2022, to March 24, 2023, are attached.

We need additional information from you, as her physician, to evaluate whether or when she can perform the essential functions of her job in the office in arriving to work on time, working her approved work schedule in the office and calling her employer if she will be late to work, with or without an accommodation.

The letter requested answers to the following seven questions:

     **i.**         Please describe the nature of the illness/condition.

     **ii.**       Please describe any limitations she has with respect to her illness/condition that would prevent Ms. Bruce from arriving to work on time based on her approved work schedule of 9:00 a.m. two days per week and 10:00 a.m. three days per week (see attached timecards from November 2, 2022, to March 24, 2023).

     **iii.**     Please indicate if Ms. Bruce can demonstrate dependability by calling or texting her supervisors and the office manager before her scheduled arrival time, if she will be late or absent from work on that particular day, based on her approved work schedule of 9:00 a.m. two days per week and 10:00 a.m. three days per week.

     **iv.**     Based on the time records, please indicate if her patterns of late arrival times weekly are what we should expect going forward, with or without an accommodation.

     **v.**      Please describe your recommended treatment plan, duration of the treatment plan, and if a change in any prescribed medicine will improve Ms. Bruce's ability to arrive to work on time in the office and to call supervisors and the office manager if she will be late or absent from work, with or without an accommodation.

     **vi.**     Please provide a date of when she will be able to perform the essential functions of her job with respect to arriving to work on time in the office and calling into supervisors and the office manager if she will be late or absent from work, with or without an accommodation.

      **vii.**      Any additional comments or suggestions.

      B.      Authorization for Release of Protected Health Information (Ms. Bruce was supposed to sign this and present it to her doctor.)

      C.      Copy of Adams and Reese's Attendance Policy

      D.      Timecards marking every time entry between November 3, 2022 – March 31, 2023, where Ms. Bruce clocked in even one minute past her start time, regardless of whether these late entries were scheduled in advance, communicated, or unexpected.

197.    Ms. Bruce encountered Mr. Cheek in the office and informed him of the contents of the questionnaire.

198.    Mr. Cheek was surprised by the allegations made in the questionnaire and the insinuations made that Ms. Bruce was not qualified to do her job.

199.    Mr. Cheek apologized to Ms. Bruce for what she was experiencing multiple times.

200.    When Ms. Bruce was walking to the elevator Mr. Cheek yelled, "you're qualified" down the hallway after her.

201.    Ms. Bruce responded that she was more than qualified, and Mr. Cheek agreed.

202.    Ms. Bruce forwarded Ms. Soileau's email to Mr. Cheek.

**(2)**    **Wednesday, April 12, 2023.**

203.    Ms. Bruce went into Mr. Cheek's office to discuss Ms. Soileau's letter before Ms. Bruce responding the letter.

204.    Mr. Cheek said he had skimmed through Ms. Soileau's request and that it was obvious to him that it had been written by an attorney whose goal was to make a case to get rid of Ms. Bruce.

205.    Mr. Cheek agreed that Ms. Soileau's allegations were not fair because they included days when Ms. Bruce's timecard entry was one minute late or days when the entire team knew Ms.

Bruce would arrive later than her scheduled time because she had an appointment scheduled.

206.    Mr. Cheek told Ms. Bruce it was not fair for an employee to request a reasonable accommodation and then endure scrutiny for making that request.

207.    Mr. Cheek told Ms. Bruce it seemed like it would take an attorney to justify what reasonable accommodation she would need, but he did not know enough about this area of the law to be able to help.

208.    Mr. Cheek told Ms. Bruce that based on Ms. Soileau's request, it seemed like the firm was setting Ms. Bruce up to fail and she should find someone more informed in this area of law to ask.

209.    Mr. Cheek said there should be clarification about whether the issue at hand was with Ms. Bruce's punctuality or her ability to do her job.

210.    Mr. Cheek advised Ms. Bruce to follow up with Ms. Soileau and request enough time to get through finals without having to deal with the emotional turmoil of resolving this conflict in the middle of exams.

211.    Mr. Cheek said this issue could be redressed after Ms. Bruce's finals.

212.    Mr. Cheek told Ms. Bruce he had made comments to Ms. Ponder about how hard Ms. Bruce had been working and how excellent her work had been during this process, despite how difficult of an experience it had been for her.

**(3)    Thursday, April 13, 2023.**

213.    When Ms. Bruce arrived at work, she noticed someone had gone through her desk drawers and inadvertently locked the drawers.

214.    Ms. Bruce informed Ms. Ponder of this information.

**(4)    Friday, April 14, 2023.**

215.    Ms. Bruce was so overwhelmed and upset about what was going on at work, that she was unable to sleep and instead spent hours crying.

**(5)** **Saturday, April 15, 2023.**

216.    At 4:01 a.m., Ms. Bruce sent an email to a trauma therapist requesting an appointment for her ongoing panic attacks, debilitating anxiety, and inability to cope with what was happening at work.

## I.    April 17, 2023 – April 21, 2023

**(1)** **Monday, April 17, 2023.**

217.    Ms. Bruce had an appointment with her psychiatrist, Dr. Jones, where they discussed the following:

A.    A full review of the Memo provided to Ms. Bruce on March 24th, Ms. Bruce's Response to the Memo submitted on March 30th, and Ms. Soileau's Medical Questionnaire packet.

B.    The Authorization for Release of Protected Health Information provided by Ms. Soileau specifically allowed the firm to re-disclose any medical information they obtained from him to others without Ms. Bruce's permission.

C.    The questionnaire did not request information that would assist the firm's understanding of any of the disabilities Ms. Bruce suffered from, nor did it ask Dr. Jones's advice or recommendations for how those conditions could be accommodated in the workplace.

D.    Additionally, the questionnaire did not provide any suggestions for accommodations the firm was considering.

E.    The questionnaire did not include a job description from the firm to assist Dr. Jones in recommending potential accommodations the firm could use.

F.    The appointment also revealed that Ms. Bruce had lost ten pounds over three weeks due to the overwhelming stress she was experiencing at work.

G.    Dr. Jones prescribed Ms. Bruce a new sleep medication.

218.     At 8:06 p.m. Ms. Bruce responded to Ms. Soileau's Medical Questionnaire informing Ms. Soileau that she had reviewed the questionnaire with her doctor that morning and asking for clarification on the essential functions of her job, a job description to present to her psychiatrist, insight into what accommodations the firm was considering so her psychiatrist could provide insight or direction, and explained she was uncomfortable with parts of the Authorization for Release of Protected Health Information form.

**(2)    Tuesday, April 18, 2023.**

219.     Ms. Bruce emailed Ms. Ponder, Mr. Cheek, and Mr. Pinson that she would be starting a new sleeping medication tonight and wanted to provide them with advance notice because she was not sure how she would react to stopping the previous medication or starting the new medication.

220.     The new medication was ineffective, and Ms. Bruce was unable to fall asleep at all.

**(3)    Wednesday, April 19, 2023.**

221.     Despite running on no sleep, Ms. Bruce went to work.

222.     The new medication was ineffective again and Ms. Bruce was unable to fall asleep for the second night in a row.

**(4)    Thursday, April 20, 2023.**

223.     Despite not having slept, Ms. Bruce went to work on April 20.

224.     Ms. Bruce was so sleep-deprived that she was afraid to operate a vehicle at the end of the workday.

225.     Ms. Bruce had to be picked up from work and driven to school by a friend.

226.     Ms. Bruce switched back to her previous sleep medication.

### J.    April 24, 2023 – April 28, 2023

**(1)    Monday, April 24, 2023.**

227.     Ms. Soileau replied to Ms. Bruce's Medical Questionnaire response at 1:41 p.m.

228. Ms. Soileau failed to address any of the concerns raised by Ms. Bruce.

A. Ms. Soileau did not address the portion of the Authorization for Release of Protected Health Information form that Ms. Bruce expressed discomfort with.

B. Ms. Soileau did not narrowly tailor her information request.

C. Ms. Soileau did not provide the job description requested by Ms. Bruce and her doctor.

D. Ms. Soileau did not provide the requested clarification on the essential functions of Ms. Bruce's job.

E. Ms. Soileau did not provide suggestions for accommodations the firm was considering for Ms. Bruce's doctor to evaluate.

229. Ms. Soileau's only change to any part of the Medical Questionnaire Packet was to delete the request to extend the patient's ability to work remotely, which had clearly been used on a previous employee and accidentally left in the form she provided Ms. Bruce.

230. Ms. Soileau asked Ms. Bruce to clarify if Ms. Bruce was still requesting an accommodation from the firm's policy that required her to contact her supervisor when she would be late to work, because if not, then Ms. Bruce's doctor would not need to complete the questionnaire.

231. Ms. Bruce had not requested that she be exempt from the firm's policy.

232. Ms. Bruce was so distraught and consumed with anxiety that she experienced another nosebleed.

**(2)** **Tuesday, April 25, 2023.**

233. Ms. Bruce requested a PTO day for a "stomach bug" because her stress was making her feel sick.

**(3)** <u>**Wednesday, April 26, 2023.**</u>

234.    Ms. Bruce's anxiety was so high she had to take an additional PTO day and stay in bed until her law school exam that evening.

**(4)** <u>**Thursday, April 27, 2023.**</u>

235.    Despite Ms. Bruce's continued exhaustion, she forced herself to go back to the office.

236.    Ms. Bruce told Mr. Cheek that the circumstances of her employment were making her miserable and depressed.

237.    Mr. Cheek told Ms. Bruce how grateful he was that she still came to work and how hard she was working, despite how bad things were getting for her in the office.

238.    Mr. Cheek told Ms. Bruce that he would be happy to provide a good reference should she seek other employment.

239.    Mr. Cheek also told Ms. Bruce he believed finding a new job would be good for her.

### K.    May 1, 2023 – May 5, 2023

**(1)** <u>**Tuesday, May 2, 2023.**</u>

240.    Ms. Bruce responded to Ms. Soileau's email from April 24th letting her know that Ms. Bruce was in the middle of her final exams, had tried a medication change which failed, and that Ms. Bruce was engaged in trauma therapy.

241.    Ms. Bruce informed Ms. Soileau that she would provide the medical questionnaire to her doctor for completion at her next appointment.

**(2)** <u>**Wednesday, May 3, 2023.**</u>

242.    Ms. Bruce emailed Ms. Ponder and Mr. Cheek at 3:32 a.m. informing them that her sleeping medication had not kicked in yet and there was a chance she would be late to work that morning.

243.    Mr. Cheek responded to thank Ms. Bruce for the heads up and advised her to get some

sleep.

244.    Ms. Bruce sent Mr. Cheek a test message at 10:26 a.m. informing him she was on her way to the office.

245.    When Ms. Bruce arrived at the office, Mr. Cheek told her that he appreciated her proactive communication.

246.    Ms. Bruce was under the impression she had handled this problem properly.

**(3)    Friday, May 5, 2023.**

247.    Ms. Soileau sent Ms. Bruce an email informing her that the 3:32 a.m. email Ms. Bruce sent on May 3rd to her supervisors advising that she "might" be late for work was unacceptable because the firm's policy requires employees to inform their employers when they *will* be late for work.

248.    Ms. Soileau also told Ms. Bruce that even though Ms. Bruce had communicated she would be late due to a car accident on the interstate the day before as outlined in the firm policy, a late arrival was unacceptable and a violation of firm policy.

249.    Even though Ms. Bruce informed Ms. Soileau that she had an upcoming appointment with her doctor about the questionnaire, Ms. Soileau demanded that Ms. Bruce electronically sign the authorization form and allow the firm to contact her doctor.

250.    Ms. Bruce's next appointment with her doctor was scheduled for Monday, May 17th.

251.    Ms. Bruce discussed this email with Mr. Cheek.

252.    Mr. Cheek told Ms. Bruce to reach out to Ms. Ponder, tell her she had become violently ill, and go home for the weekend.

### L.    May 8, 2023 – May 12, 2023

**(1)    Monday, May 8, 2023.**

253.    Ms. Bruce experienced another panic attack getting ready for work.

254.    Ms. Bruce sent an email at 6:39 a.m. to Ms. Ponder, Mr. Cheek, and Mr. Pinson informing

them of the panic attack and requesting a PTO day to get her anxiety under control before her exam that evening.

255.    Ms. Ponder responded to Ms. Bruce's email that she hoped Ms. Bruce felt better soon and wished Ms. Bruce luck on her exam.

**(2)    Wednesday, May 10, 2023.**

256.    Ms. Bruce's medication caused her to oversleep.

257.    Ms. Bruce texted Ms. Ponder, Mr. Pinson, and Mr. Cheek at 8:29 a.m. that she had overslept but was on her way.

258.    Ms. Bruce spoke to Mr. Cheek on the phone at 8:37 a.m. and sent him a follow-up text at 8:45 a.m. apologizing for being cranky and explaining she was still sedated from her medication.

259.    Ms. Bruce spoke to Mr. Cheek about whether she could list him as the point of contact for her bar application if she got fired from the firm.

260.    Mr. Cheek informed Ms. Bruce that he had submitted a very positive annual review on her behalf and that she was doing a lot of things really well.

261.    Mr. Cheek acknowledged that what was happening to Ms. Bruce probably felt really awful.

262.    Mr. Cheek told Ms. Bruce he hoped she could find a way out of the firm without the firm being able to say anything negative about her and without having to list being fired on her bar application.

263.    Mr. Cheek told Ms. Bruce to continue doing what she was doing and that it was really admirable.

264.    Mr. Cheek told Ms. Bruce he understood how hard it must be to "come into a place that wants to kill you and dive in as if nothing is happening."

265.    Ms. Bruce told Mr. Cheek her last final exam was the next day and she hoped things at work would improve afterward.

266. Mr. Cheek reminded Ms. Bruce he was going to be out of town for a week, and Ms. Bruce told Mr. Cheek that his being gone for a week made her concerned about her job.

**(3)** **Thursday, May 11, 2023.**

267. Ms. Bruce could not sleep, so she decided to put some finishing touches on her take-home exam around midnight.

268. At 1:30 a.m., Ms. Bruce's computer crashed and completely corrupted her open exam file.

269. Ms. Bruce immediately emailed Ms. Ponder, Mr. Cheek, and Mr. Pinson informing them of what had happened, and reminding them that the exam was due by 5:00 p.m. and was worth 100% of her grade. If Ms. Bruce had not completed the exam and submitted it on time, she would have failed the class and not advanced to her final year of law school.

270. Ms. Bruce requested to use her PTO to redo the exam and even offered to work over the weekend if any of her projects needed attention.

271. Ms. Bruce spoke with her doctor at 2:25 p.m. requesting he draft a letter asking the firm to provide accommodations such as a flexible schedule, a remote schedule, or intermittent FMLA.

272. At 5:45 p.m., 45 minutes before Ms. Bruce's last final exam and six days before Ms. Bruce's doctor's appointment, Ms. Soileau emailed Ms. Bruce that she was terminated from her position at Adams and Reese.

**(4)** **Friday, May 12, 2023.**

273. At 10:58 a.m., Ms. Bruce texted Ms. Ponder and offered to clean out her office after business hours if needed.

274. At 11:55 a.m., Ms. Ponder informed Ms. Bruce she would need to be at the office at 3:30 p.m. to clean out her office.

275. Ms. Bruce was required to clean out her office in the middle of the business day in front of all her co-workers, who were not allowed to speak to her.

29

276.    Ms. Bruce was once again humiliated in front of the entire office.

## M.    After Ms. Bruce was Terminated

277.    Despite her diligent efforts, Ms. Bruce was unable to find stable, full-time employment until March of 2024.

278.    Following her termination, Ms. Bruce's anxiety, panic attacks, and depression severely worsened.

279.    Ms. Bruce felt an overwhelming increase in shame for struggling with her disabilities.

280.    Ms. Bruce's struggle with these mental health issues began impacting every aspect of her life.

281.    Ms. Bruce's "friends" she had worked with were no longer allowed to speak to her.

282.    Ms. Bruce lost her mentor and friend, Mr. Cheek, because of the firm's actions.

283.    Ms. Bruce further secluded into isolation by pulling away from the relationships she had left.

284.    There were multiple days over the next six months when Ms. Bruce was unable to get out of bed because she was so depressed.

285.    Ms. Bruce struggled with feelings of helplessness and worthlessness during this period.

286.    Ms. Bruce's mental health declined so drastically that she started struggling with self-hatred, suicidal thoughts, and suicidal ideation.

287.    Defendant's treatment of Ms. Bruce over the forty-nine days between the meeting on March 24, 2023, and forcing her to clean out her office in front of her co-workers on May 12, 2023, caused severe emotional damage to Ms. Bruce.

## N.    Sexual Harassment by Rob Pinson

288.    As stated above, one of Ms. Bruce's supervising attorneys was Rob Pinson.

289.    Mr. Pinson's ongoing sexual harassment and retaliatory actions occurred throughout the

30

entirety of Ms. Bruce's career at both Defendant's firm and her previous firm.

290.    The harassment started with Mr. Pinson pressuring Ms. Bruce to accompany him on social outings.

291.    Mr. Pinson's professional treatment of Ms. Bruce would be based on whether Ms. Bruce acquiesced to his requests or tolerated his comments.

292.    Mr. Pinson left tickets to a concert in Ms. Bruce's chair at work on July 26, 2019, even after she said she did not want to go and texted her during the concert trying to pressure her into coming.

293.    Mr. Pinson asked Ms. Bruce out for drinks on July 30, 2019, but she rejected the invitation.

294.    Mr. Pinson asked Ms. Bruce out for drinks on August 1, 2019, and added pressure when she initially said no. Ms. Bruce finally acquiesced.

295.    Mr. Pinson asked Ms. Bruce out for drinks on August 16, 2019.  Ms. Bruce told him no because she had to write a paper for school.  Mr. Pinson continued asking and offered to make a special work request with Human Resources for Ms. Bruce, and Ms. Bruce reluctantly agreed.

296.    Mr. Pinson asked Ms. Bruce out for drinks on August 21, 2019.  Ms. Bruce said no.  Mr. Pinson tried to pressure her into agreeing, but Ms. Bruce refused.

297.    Mr. Pinson randomly reached out to Ms. Bruce on September 4, 2019, asking whether Ms. Bruce received a raise for joining the Liquor Group. When Ms. Bruce said no, Mr. Pinson offered to speak with Human Resources to demand a raise on Ms. Bruce's behalf.  In addition, Mr. Pinson told Ms. Bruce he would always be willing to "help" if she ever needed money.

298.    Mr. Pinson asked Ms. Bruce to join him for drinks on September 9, 2019.  Ms. Bruce said no and elaborated that she had already gone home for the evening.  Mr. Pinson then asked if she would join him and a client that Thursday, September 12th, or at least pre-party with Mr. Pinson.

299.     When September 12, 2019, rolled around, Mr. Pinson followed up on his request.  Ms. Bruce was busy helping a co-worker with a project and told him so.  Mr. Pinson continued following up until Ms. Bruce finally agreed.

300.     On September 25, 2019, Mr. Pinson asked Ms. Bruce to join him for drinks again.  Mr. Pinson asked five times, despite Ms. Bruce's five rejections. Mr. Pinson finally stopped pressuring Ms. Bruce after the fifth rejection.

301.     On September 26, 2019, Mr. Pinson sent Ms. Bruce a text message demanding to know why she had not joined him.

302.     Mr. Pinson texted Ms. Bruce on October 25, 2019, repeatedly while she was on a date pressuring her to join him out for drinks.  His text messages continued for over two hours.

303.     Mr. Pinson asked Ms. Bruce to join him for drinks again on December 2, 2019.  Ms. Bruce said no and informed him she had a paper to write.  Mr. Pinson asked two more times before he stopped pressuring her.

304.     Mr. Pinson gave Ms. Bruce a $1,000 bonus from his personal finances on December 6, 2019.

305.     Mr. Pinson asked Ms. Bruce to join him for drinks again on January 23, 2020.  Ms. Bruce said no three times and finally had to stop responding to get Mr. Pinson to stop pressuring her.

306.     On January 24, 2020, Ms. Bruce was attending a concert with her family.  Mr. Pinson was also attending the concert.  Mr. Pinson offered to sneak Ms. Bruce into the firm's suite, but Ms. Bruce said no and tried telling Mr. Pinson she was happy with the seats she had.  Mr. Pinson told Ms. Bruce to look for him and said he was "the one flashing the audience."

307.     After Ms. Bruce's lack of excitement over the January 24th incident, Mr. Pinson became much more demanding at work.  He would text her weeks before a deadline expecting a project to

be done and if Ms. Bruce had not finished Mr. Pinson would tell her that he would just have someone else do it.

308.    This continued until March 10, 2020, when Mr. Pinson asked Ms. Bruce if she wanted to join him for Nashville Flavors and offered to pick her up from home. Ms. Bruce told Mr. Pinson her dog had to be sedated and was struggling to breathe. Despite this, Mr. Pinson still tried pressuring Ms. Bruce into going out with him.

309.    On March 31, 2020, Ms. Bruce received her acceptance letter from the Nashville School of Law.  Ms. Bruce texted a photo of the letter to Mr. Pinson telling him she got in.  Mr. Pinson responded with "All those handjobs [he] gave really paid off!" followed up by telling Ms. Bruce how much his wrist hurt.

310.    Ms. Bruce was laid off from Waller in response to the COVID epidemic.

311.    Despite no longer being on the team, Mr. Pinson still reached out to Ms. Bruce multiple times over the next year saying he missed her, how much he wished he could have her back on the team, inviting her to events and even tried encouraging her to start dating married men as if suggesting himself. Ms. Bruce did not accept his invitations.

312.    Ms. Bruce rejoined the Liquor Group in April of 2021.

313.    Ms. Bruce was able to avoid any uncomfortable situations with Mr. Pinson for almost two months.

314.    On May 25, 2021, Mr. Pinson texted Ms. Bruce letting her know that he had pulled strings to get her access to a friends and family event hosted by her favorite county music star, but only if she went as his guest.

315.    Mr. Pinson started asking Ms. Bruce out for drinks again on August 13, 2021. Ms. Bruce declined and told Mr. Pinson she had plans.

316.    Mr. Pinson asked Ms. Bruce to join him for drinks on September 17, 2021.  Ms. Bruce informed him that she was on a date, and they were waiting for their food at a specific restaurant. Mr. Pinson showed up at the restaurant and interrupted the date. Mr. Pinson asked Ms. Bruce and her date to stop by the bar he was at afterward. Ms. Bruce's date seemed excited at the invitation, so they agreed.

317.    Joining Mr. Pinson on September 17th seemed to place Ms. Bruce back in his good graces.

318.    On September 20, 2021, Mr. Pinson even volunteered to speak with Human Resources about a rumor that was going around the firm on behalf of Ms. Bruce.

319.    On October 30, 2021, Mr. Pinson asked Ms. Bruce if she would be willing to leave Waller and join him at another firm.

320.    On November 11, 2021, Mr. Pinson once again offered to defend Ms. Bruce with his superiors over something that was posted on Facebook.

321.    Ms. Bruce was able to avoid additional invitations over the next few months because she had limited interactions with Mr. Pinson. The law firm the Liquor Group worked at was hit with a ransomware attack that caused the office to shut down for a few weeks in November and December, and then most of the team was out of the office for the last part of December and early January.

322.    Ms. Bruce entered into a serious relationship with her future fiancé on January 1, 2022, and Mr. Pinson seemed to be respectful about it at first.

323.    In January 2022, Mr. Pinson enlisted Ms. Bruce's assistance with convincing team members to change firms.

324.    Mr. Pinson gave Ms. Bruce a $500 bonus from his personal finances on January 21, 2022.

325.    Along with the financial bonus, Mr. Pinson wrote Ms. Bruce a Thank-You card that said:

"Randi – I truly appreciate everything you have done, both for me and for the AB team. You are truly loved and a part of the AB team family. I do not know what I would do without you. Thank you, thank you, thank you. Yours Always, Rob."

326. On February 2, 2022, Mr. Pinson texted Ms. Bruce around 12:30 a.m. to wish her happy birthday (a day early), and when she responded with thank you, he asked her if she wanted him to come join her at her house since she was awake.

327. Ms. Bruce immediately replied with No.

328. Ms. Bruce informed Mr. Cheek of what Mr. Pinson had asked.

329. Mr. Cheek told Ms. Bruce he had observed Mr. Pinson's actions and heard things said by Mr. Pinson that Mr. Cheek knew were inappropriate.

330. Mr. Cheek told Ms. Bruce that Mr. Pinson's behavior was not right.

331. Ms. Bruce never acquiesced to any of Mr. Pinson's unprofessional requests again and did her best to stay distanced from him.

332. Mr. Pinson seemed to focus on the transfer of firms over the next few months and rarely made an appearance at the office.

333. Once the team transitioned to Adams and Reese, Mr. Pinson's presence in the office was even more rare.

334. Despite regularly being out of the office, while working at Adams and Reese, Mr. Pinson continued sexually harassing Ms. Bruce when he was in the office.

335. The harassment included Mr. Pinson making sexual comments and jokes to and about Ms. Bruce, as well as making inappropriate comments about Ms. Bruce's appearance, clothing, and private life.

336. Following Mr. Pinson's proposition to her on February 2, 2022, Ms. Bruce became more

and more uncomfortable with Mr. Pinson's behavior and went out of her way to avoid him.

337.  By the Fall of 2022, Ms. Bruce hardly spoke to Mr. Pinson unless he reached out to her about a specific client or project.

338.  Unbeknownst to Ms. Bruce, on Friday, September 30, 2022, Mr. Pinson told Ms. Ponder and Mr. Cheek he wanted Ms. Bruce terminated because she had not personally informed him that she would not be in the office that day.

339.  Mr. Pinson sent Ms. Bruce a text message on Sunday, October 2, 2022, that her actions on the previous Friday "had not helped things."

340.  Ms. Bruce responded with a lot of confusion because she did not understand what "things" she "had not helped."

341.  Mr. Pinson informed Ms. Bruce that Ms. Ponder had been searching for her Friday morning and was concerned because she did not know where Ms. Bruce was.

342.  Mr. Pinson told Ms. Bruce that Ms. Ponder was so troubled by this that Ms. Ponder had involved her boss, the Director of Human Resources.

343.  Ms. Bruce knew Ms. Ponder had been out of town that day.

344.  Mr. Pinson also told Ms. Bruce that it was perfectly fine for her to do homework or work on personal matters during business hours, as long as Ms. Bruce was in the office and clocked in.

345.  Ms. Bruce spoke with Ms. Ponder on October 3, 2022, trying to understand what Mr. Pinson had been talking about.

346.  Ms. Ponder told Ms. Bruce that Mr. Pinson reached out to her while she was out of town asking where Ms. Bruce was.

347.  Ms. Bruce was informed that Mr. Pinson was pushing for her to be terminated, so Ms. Bruce scheduled a time to meet with him on October 5, 2022.

348. Mr. Pinson once again told Ms. Bruce that Ms. Ponder was the one looking for her and that he would never go by her office to ask where Ms. Bruce was.

349. Ms. Bruce specifically asked Mr. Pinson if he wanted her off of the team or if there were flaws with her work product.

350. Mr. Pinson told Ms. Bruce repeatedly that he had never mentioned anything about wanting to terminate her.

351. Mr. Pinson told Ms. Bruce he never talked to Human Resources or the Office Manager about Ms. Bruce.

352. Mr. Pinson said he would never try to get Ms. Bruce fired.

353. Ms. Bruce told Mr. Cheek and Ms. Ponder that she did not know how she was supposed to handle this issue with Mr. Pinson.

354. Ms. Bruce was convinced that complaining about her situation to Adams and Reese Human Resources would lead to negative results and additional retaliation.

355. Ms. Bruce felt like she had no choice but to resort back to accepting Mr. Pinson's harassment to keep her job with Adams and Reese.

356. Mr. Pinson's inappropriate comments and jokes to and about Ms. Bruce continued to develop while at Adams and Reese.

357. When Mr. Pinson learned of Ms. Bruce's engagement in December of 2022, his harassment started to include inappropriate comments related to the engagement and Ms. Bruce's relationship.

358. Mr. Pinson's comments and jokes started occurring even in work-related conversations with Ms. Bruce.

359. Mr. Pinson's comments and jokes started occurring in team meetings at Adams and Reese.

360. Mr. Pinson would say, "Let's have Randi go down there in a short skirt."

361.   Mr. Pinson would say "Hoe no" instead of "Oh no" when talking to Ms. Bruce.

362.   On April 19, 2023, Mr. Pinson made sexually suggestive comments about how "hot" it would be to see Ms. Bruce and another paralegal engaging in sexual acts on his desk.

## VI.    CAUSES OF ACTION

### A.    <u>Failure to Accommodate and Failure to Engage in the Interactive Process</u>

363.   Ms. Bruce is a qualified individual with a disability, as defined by the ADA, 42 U.S.C. § 12102, 12111, as amended.

364.   According to Mr. Cheek's communications with Ms. Bruce, her employee evaluation submitted to the Defendant by Mr. Cheek, and the comments made by both Mr. Cheek and Mr. Pinson during the March 24th meeting, Ms. Bruce was not only qualified for her position, but she was consistently improving in skill the longer she spent in the position.

365.   Ms. Bruce had multiple disabilities that warranted a reasonable accommodation.

366.   Defendant could have provided Ms. Bruce with a reasonable accommodation to her known disabilities without imposing an undue hardship on the conduct of their business.

367.   After Ms. Bruce requested an accommodation, Defendant failed to engage in the interactive process with good faith to identify a reasonable accommodation for Ms. Bruce's known disabilities.

368.   Despite her lack of training or knowledge of this process, Ms. Bruce made multiple good faith attempts to resolve the conflict with the Defendant.

369.   Defendant failed to address multiple concerns raised by Ms. Bruce regarding the Authorization Release form, the Medical Questionnaire, or potential accommodation options during the interactive process.

370.   Defendant listed the only essential functions of Ms. Bruce's job in the Medical Questionnaire as arriving to work on time, working her approved work schedule in the office, and

calling her employer if she will be late to work.

371.    Ms. Bruce requested additional information about the essential functions determined by Defendant because other employees with the same position on Ms. Bruce's team were allowed to work remotely.

372.    Defendant failed to discuss the essential functions of the job with Ms. Bruce.

373.    Defendant failed to provide Ms. Bruce with the requested job description.

374.    Defendant repeatedly changed the standards and requirements expected of Ms. Bruce during the interactive process making it impossible for Ms. Bruce to succeed.

375.    Defendant abused the interactive process and used it to further insult, harm, and discriminate against Ms. Bruce.

376.    Defendant is responsible for the breakdown in the interactive process because of, *inter alia*, its failure to train its supervisors on how to properly handle accommodation requests.

377.    Defendant's failure to accommodate Ms. Bruce constitutes disability discrimination, in violation of the ADA.

378.    Defendant intentionally discriminated against Ms. Bruce.

379.    Defendant acted maliciously and/or with reckless indifference to Ms. Bruce's rights.

380.    As a direct and proximate result of the Defendant's unlawful acts, Ms. Bruce has been unable to cope with the mental stress caused by the dehumanizing treatment and termination.

381.    Specifically, Ms. Bruce has developed psychological manifestations of emotional distress, including, but not limited to, panic attacks, depression, anxiety, shame, loss of enjoyment of life, humiliation, embarrassment, anger, suicidal thoughts, and suicidal ideation.

382.    Additionally, Ms. Bruce has suffered from harm to her professional reputation as a direct and proximate result of Defendant's unlawful acts

## B.    Retaliation, Hostile Work Environment, and Discriminatory Discharge

383.    Ms. Bruce received an email terminating her employment with Defendant at 5:45 p.m. on May 11, 2023.

384.    Ms. Soileau informed Ms. Bruce she was being terminated because the firm had not yet received a completed Medical Questionnaire from her doctor or a signed Medical Authorization form from Ms. Bruce and without these the firm was unable to evaluate whether Ms. Bruce's punctuality was something the firm could accommodate.

385.    Defendant consistently made it more and more difficult for Ms. Bruce to fulfill the constantly changing requirements.

386.    Defendant failed to provide the information needed for Ms. Bruce's doctor to complete their medical questionnaire.

387.    Defendant discharged Ms. Bruce for not providing them with the medical questionnaire even though they knew Ms. Bruce had a scheduled appointment with her doctor for this specific reason.

388.    Defendant subjected Ms. Bruce to severe or pervasive retaliatory harassment in response to her requests for a reasonable accommodation, assertion of her rights, and opposition to illegal discrimination.

389.    Defendant's retaliatory harassment of Ms. Bruce created an abusive work environment and unreasonably interfered with her work performance.

390.    Defendant terminated Ms. Bruce based on her disability and in retaliation for her request for a reasonable accommodation.

391.    Defendant acted maliciously and/or with reckless indifference to Ms. Bruce's rights.

392.    As a direct and proximate result of the Defendant's unlawful acts, Ms. Bruce has been unable to cope with the mental stress caused by the dehumanizing treatment and termination.

393.     Specifically, Ms. Bruce has developed psychological manifestations of emotional distress, including, but not limited to, panic attacks, depression, anxiety, shame, loss of enjoyment of life, humiliation, embarrassment, anger, suicidal thoughts, and suicidal ideation.

394.     Additionally, Ms. Bruce has suffered from harm to her professional reputation as a direct and proximate result of Defendant's unlawful acts

### C.     Sexual Harassment and Hostile Work Environment

395.     Ms. Bruce also faced discrimination based on sex in the form of ongoing sexual harassment.

396.     Throughout the three years Ms. Bruce worked with this team, she was consistently subjected to unwelcome verbal conduct of a sexual nature by her supervisor, Mr. Pinson.

397.     While working at Adams and Reese, the harassment was persistent, ongoing, and continued up until the day Ms. Bruce was fired on May 11, 2023.

398.     The harassment took place during and outside of Adams and Reese work hours and offices.

399.     Mr. Pinson's behavior became aggressive enough to create a hostile work environment.

400.     Ms. Bruce reported her concerns to her manager at Adams and Reese, Will Cheek.

401.     Mr. Cheek told Ms. Bruce he had observed Mr. Pinson's actions and heard things said by Mr. Pinson that Mr. Cheek knew were inappropriate.

402.     Mr. Cheek told Ms. Bruce that Mr. Pinson's behavior was not right.

403.     Ms. Bruce is unaware if Mr. Cheek ever spoke with Mr. Pinson or the firm about the behavior he observed.

404.     This harassment was persistent, ongoing, and continued up until the day Ms. Bruce was fired on May 11, 2023.

405.     Mr. Pinson was Ms. Bruce's direct supervisor while working for Adams and Reese.

406.     Defendant Adams and Reese is vicariously liable for the hostile work environment created

by Mr. Pinson's sexual harassment.

407.   Mr. Pinson's sexual harassment of Ms. Bruce resulted in Ms. Bruce's termination.

408.   Even if Mr. Pinson was not charged with making the ultimate employment decision, Mr. Pinson was the driving force behind her termination because he initiated the conversations with the Defendant about terminating Ms. Bruce after she stopped acquiescing to his inappropriate requests and behaviors.

## VII.   PRAYERS FOR RELIEF

409.   WHEREFORE, Ms. Bruce prays that he be granted the following relief:

A.   Enter judgment against Defendant, declare that the actions of Defendant violate the ADA, and enjoin Defendant from further discriminatory or retaliatory practices;

B.   Order Defendant to pay Ms. Bruce back pay, lost benefits, and other pecuniary losses proximately caused by Defendant's unlawful conduct, including an appropriate amount to offset increased tax consequences of any lump sum payment;

C.   Order Defendant to pay Ms. Bruce front pay and the value of future lost benefits;

D.   Order Defendant to pay Ms. Bruce compensatory damages in an amount to be determined by a jury;

E.   Order Defendant to pay Ms. Bruce punitive damages in an amount to be determined by a jury;

F.   Order Defendant to pay all costs, disbursements, pre-judgment interest, post-judgment interest, expert witness fees, and reasonable attorney's fees as allowed by law;

G.   Grant Ms. Bruce all such further relief as she is entitled to under law and/or as the Court deems just and proper; and

H.   Ms. Bruce requests a jury trial in this case.

THE PLAINTIFF DEMANDS A TRIAL BY JURY.

/s/ David Weatherman
David Weatherman (TBPR 29446)
**THE WEATHERMAN FIRM**
256 Seaboard Lane, Suite E105
Franklin, TN 37067
Phone: 615-538-7555
David@TheWeathermanFirm.com

/s/ Daniel E. Arciniegas
Daniel E. Arciniegas (TBPR 35853)
**ARCINIEGAS LAW**
256 Seaboard Lane, Suite E105
Franklin, TN 37067
Phone: 629-777-5889
Daniel@AttorneyDaniel.com
AttorneyDaniel.com

***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on Thursday, October 3, 2024, I electronically filed the foregoing **AMENDED COMPLAINT** with the Clerk of the Court by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

Brent E. Siler (TN BPR 022289)
ADAMS & REESE, LLP
6075 Poplar Avenue, Suite 700
Memphis, Tennessee 38119
Tel: (901) 525-5273
Fax: (901) 524-5373
Brent.siler@arlaw.com

S/ David Weatherman
David Weatherman