# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **RANDI MARIE BRUCE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:24-cv-00875** |
| | ) | **Judge Aleta A. Trauger** |
| **ADAMS AND REESE, LLP,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

In her First Amended Complaint ("FAC") (Doc. No. 18), plaintiff Randi Bruce sets forth claims against her former employer, defendant Adams and Reese, LLP ("A&R"), under the Americans with Disabilities Act ("ADA") for failure to accommodate a disability and failure to engage in the interactive process and for "retaliation, hostile work environment, and discriminatory discharge" (*id.* at 40). She also sets forth a claim under Title VII of the Civil Rights Act of 1964 ("Title VII"), for "sexual harassment and hostile work environment" that, the plaintiff alleges, "resulted in [her] termination." (*Id.* ¶ 407).[1] Now before the court are two motions filed by A&R: (1) its Second Motion to Dismiss (Doc. No. 21), which is actually a motion for partial dismissal, as it challenges only the viability of the plaintiff's Title VII claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure; and (2) its Motion to Compel Arbitration (Doc. No. 13) of the ADA claims.

It is clear from the parties' briefing that Bruce and A&R executed an otherwise valid and

---

[1] The plaintiff also brings her sexual harassment claim under the Tennessee Human Rights Act ("THRA"), but discrimination and retaliation claims under the THRA are reviewed under the same standards as claims brought under Title VII. *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008). The court therefore analyzes the claims solely under federal law.

binding Arbitration Agreement in May 2022, when Bruce began working for A&R, in which the parties mutually agreed to "submit any and all claims that may arise between A&R and [Bruce] that cannot be resolved internally to binding arbitration," subject to certain exceptions not at issue here. (Doc. No. 14-1 at 3, 6.) It is also undisputed that (1) the recently enacted Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021, 9 U.S.C. §§ 401, 402, is implicated by the plaintiff's sexual harassment claim; and (2) if the sexual harassment claim is subject to dismissal under Rule 12(b)(6), the remaining claims under the ADA will be subject to arbitration.[2] What is disputed here is whether the FAC states a colorable claim for sexual harassment under Title VII and, if that claim is *not* dismissed, whether the entire case must be tried in this court or whether, alternatively, the ADA claims must be severed and referred to arbitration.

As set forth herein, the court finds that the FAC states a colorable claim for sexual harassment but fails to state a claim for retaliation under Title VII. Because the FAC states a claim for sexual harassment that withstands the defendant's Rule 12(b) motion, under 9 U.S.C. § 402(a), the Arbitration Agreement is unenforceable as to the entire case.

## I.    MOTION TO DISMISS

### A.    Standard of Review

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Such a motion is

---

[2] Several courts have held that only plausibly pleaded sexual harassment claims implicate the EFAA and that, if such claims are subject to dismissal under Rule 12(b)(6), any remaining claims will be subject to an otherwise enforceable arbitration agreement. *See, e.g.*, *Scoggins v. Menard, Inc.*, No. 2:24-CV-00377, 2024 WL 3860464, at *7 (S.D. Ohio Aug. 19, 2024) ("Plaintiff's claim is pled such that it would overcome a 12(b)(6) motion to dismiss, which places the claim within the substantive purview of the EFAA."); *Yost v. Everyrealm, Inc.*, 657 F. Supp. 3d 563, 588 (S.D.N.Y. 2023) (holding that, "with the SAC's sexual harassment claims having been dismissed as implausible, the EFAA no longer has any bearing on this litigation").

properly granted if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020). To survive a motion to dismiss, a complaint must allege facts that, if accepted as true, are sufficient to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007); *see also* Fed. R. Civ. P. 8(a)(2). A complaint has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (2007). A complaint that "tenders 'naked assertions' devoid of 'further factual enhancement'" will not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

In ruling on a motion to dismiss under Rule 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

"[A] plaintiff generally need not plead the lack of affirmative defenses to state a valid claim." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). Thus, when a defendant raises an affirmative defense as a basis for dismissing a complaint (or a claim therein), the court, in evaluating the affirmative defense, must "only look to the facts alleged in the plaintiff's complaint, albeit alongside the legal elements of the affirmative defense raised in the defendant's motion to dismiss." *Goins v. Saint Elizabeth Med. Ctr.*, 640 F. Supp. 3d 745, 751 (E.D. Ky. 2022) (citing *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009)). "If the elements of an

affirmative defense are met by the factual allegations contained in the complaint, then the district court may grant the motion to dismiss." *Id.*; *see also Kreipke v. Wayne State Univ.*, 807 F.3d 768, 784 (6th Cir. 2015) ("Where an affirmative defense appears 'clearly on the face of the complaint,' . . . a court may dismiss a complaint under Rule 12(b)(6) for failure to state a claim.").

### B.    Factual and Procedural History

According to the Amended Complaint, the well pleaded allegations of which the court accepts as true for purposes of the Motion to Dismiss, A&R is a law firm with an office in Nashville, Tennessee, and Bruce was a paralegal at that office beginning in May 2022, when she was recruited by A&R from another Nashville law firm where she was employed at the time. At least two of the attorneys with whom she worked at the previous law firm were also recruited by A&R and were apparently responsible for bringing Bruce on board as well. These attorneys were Will Cheek and Rob Pinson. Although the plaintiff's allegations regarding her history of abuse and her attendant medical diagnoses are not relevant here and will not be discussed in great detail, the plaintiff alleges that both Cheek and Pinson were aware of her history, diagnoses, and disabilities before recruiting her to go work with them at A&R.

Bruce was interviewed at A&R on April 26, 2022. Both Pinson and A&R's Office Manager, Brooke Ponder, were present at that meeting. Bruce's first day at A&R was May 16, 2022. Both Pinson and Cheek acted as her supervising attorneys while she was employed at A&R.

The plaintiff alleges that Pinson's "harassing" behavior began prior to their move to A&R and largely consisted of Pinson's "pressuring" Bruce to accompany him on social outings. She identifies several specific instances in 2019 when this occurred, while they were both still employed at their previous law firm. She sometimes said "yes" but usually said "no" to these invitations. Despite Bruce's declining another such invitation on December 2, 2019, Pinson gave her a $1,000 bonus from his personal finances on December 6, 2019. The invitations and the

pressure to accept them continued through March 2020, when Bruce was laid off temporarily due to the COVID pandemic. Around the same time, Pinson made an inappropriate comment in response to her telling him that she had been accepted at the Nashville School of Law.[3]

Even while she was absent from the firm for a year, Pinson reached out to Bruce several times to say how much he missed her, and he "encourag[ed] her to start dating married men as if suggesting himself," but Bruce rejected these invitations. (Doc. No. 18 ¶ 311.) Shortly after Bruce rejoined the firm in April 2021, Pinson started back pressuring her to attend social events with him and asking her out for drinks; she usually declined. Despite her continuing to reject his invitations, Pinson asked Bruce in October 2021 if she would be willing to leave the law firm and join him at a different firm. In January 2022, she began a serious relationship with her future fiancé, and Pinson was initially respectful. He gave her a $500 bonus from his personal finances and wrote her an effusive thank you note at the end of January 2022.

On February 2, 2022, Pinson texted Bruce at 12:30 a.m. to wish her a happy birthday. When she responded immediately with a "thank you," he "asked her if she wanted him to come join her at her house since she was awake." (*Id.* ¶ 326.) She replied "no" immediately. (*Id.* ¶ 327.) Bruce informed Will Cheek, whom she viewed as a mentor, about this comment. Cheek told her he had observed Pinson say and do inappropriate things and that his behavior on the instance in question was "not right." (*Id.* ¶ 330.) All of these events took place *before* the plaintiff, Cheek, or Pinson was employed by A&R.

Over the next few months, as Pinson transitioned to A&R from the previous law firm, he was rarely in the office. Once the entire "team" to which Bruce belonged moved to A&R,

---

[3] His response was, "All those handjobs [he] gave really paid off!" and telling her how much his wrist hurt, apparently implying that she was accepted because of sexual favors he provided to officials at the school that had accepted her. (Doc. No. 18 ¶ 309.)

presumably including Bruce herself, Pinson's "presence in the office was even more rare." (*Id.* ¶ 333.) But, the plaintiff says, "Mr. Pinson continued sexually harassing Ms. Bruce when he was in the office." (*Id.* ¶ 334.) The harassment "included Mr. Pinson making sexual comments and jokes to and about Ms. Bruce, as well as making inappropriate comments about Ms. Bruce's appearance, clothing, and private life." (*Id.* ¶ 335.) After his February 2, 2022 "proposition," Bruce became "more and more uncomfortable" with his behavior and "went out of her way to avoid him." (*Id.* ¶ 336.) By the fall of 2022, she "hardly spoke to Mr. Pinson unless he reached out to her about a specific client or project." (*Id.* ¶ 337.)

Bruce asserts that, unbeknownst to her, on Friday, September 30, 2022, Pinson reached out to Brooke Ponder and Cheek to tell them he wanted Bruce to be terminated "because she had not personally informed him that she would not be in her office that day." (*Id.* ¶ 338.) Pinson then sent her a text message on Sunday, October 2, 2022, stating that her actions on Friday, September 30, 2022 "had not helped things." (*Id.* ¶ 339.) The plaintiff was confused and asked what he meant. Pinson responded that *Ponder* had been searching for her on Friday morning and was concerned because she did not know where Bruce was. Pinson told her that Ponder was "so troubled by this" that she had involved the Director of Human Resources. (*Id.* ¶ 342.) Bruce, however, knew that Ponder had been out of town on Friday. When she spoke with Ponder on October 3, 2022, trying to understand what Pinson had been talking about, Ponder told her that *Pinson* had reached out to her while she was out of town to ask where Bruce was and that Pinson was pushing for Bruce to be terminated.[4]

---

[4] In the context of pleading the facts supporting her ADA claims, the plaintiff alleges that, around October 2, 2022, she was "informed that the firm considered her communication" regarding her start times to be inadequate. (Doc. No. 18 ¶ 55.) That issue appeared to be resolved by the plaintiff's including Ponder on emails informing her team that she would be late on a particular

Bruce scheduled a meeting with Pinson on October 5, 2022. During this meeting, Pinson denied saying anything about wanting to have her terminated, denied talking to Ponder or the HR Director about her, and affirmed that he would "never try to get [her] fired." (*Id.* ¶ 352.)

The plaintiff states that she was "convinced that complaining about her situation to Adam and Reese Human Resources would lead to negative results and additional retaliation," and she felt she "had no choice but to resort back to accepting Mr. Pinson's harassment to keep her job." (*Id.* ¶¶ 354, 355.) So, Bruce alleges, Pinson's "inappropriate comments and jokes to and about" her continued. (*Id.* ¶ 356.) When Pinson learned that Bruce had become engaged in December 2022, his "harassment started to include inappropriate comments related to the engagement and Ms. Bruce's relationship." (*Id.* ¶ 357.) These comments "started occurring even in work-related conversations" with Bruce and during team meetings. (*Id.* ¶¶ 358–59.) For example, Pinson would say things like, "Let's have Randi go down there in a short skirt." (*Id.* ¶ 360.) When talking to her, he would say "Hoe no" instead of "Oh no." (*Id.* ¶ 361.) On April 19, 2023, he made "sexually suggestive comments about how 'hot' it would be to see Ms. Bruce and another paralegal engaging in sexual acts on his desk." (*Id.* ¶ 362.)

As set forth in the FAC within the context of detailing the facts supporting Bruce's ADA claims, her employment with A&R was terminated on May 11, 2023.

Under the "Causes of Action" heading articulating the elements of her "sexual harassment and hostile work environment" claim, the plaintiff asserts that, while working for A&R, she experienced "persistent, ongoing, and continued" sexual harassment from Pinson, in the form of "unwelcome verbal conduct of a sexual nature," up until the day she was fired. (*Id.* ¶¶ 396–97.)

---

day, at least until late-March 2023, when the plaintiff began to have trouble with side effects related to her medication. (*Id.* ¶¶ 59–63.)

She asserts that Pinson's behavior "became aggressive enough to create a hostile work environment"; that she reported her concerns to Cheek, her manager; that Cheek had observed Pinson's inappropriate actions and comments and had told Bruce that Pinson's conduct was "not right"; that Pinson also functioned as her direct supervisor; that A&R is vicariously liable for the hostile work environment created by Pinson's sexual harassment; and that the sexual harassment "resulted in Ms. Bruce's termination." (*Id.* ¶¶ 399–407.) Regarding her termination, Bruce asserts that, even if Pinson did not make the ultimate employment decision, he was "the driving force behind her termination because he initiated the conversations with the Defendant about terminating Ms. Bruce after she stopped acquiescing to his inappropriate requests and behaviors." (*Id.* ¶ 408.)

The plaintiff filed her lawsuit in July 2024. According to documents attached to the original Complaint, the plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging disability discrimination and retaliation. (Doc. No. 1-1.)[5] The plaintiff received her Notice of Right to Sue from the EEOC around April 23, 2024 (Doc. No. 1-2) and filed suit within 90 days thereafter.

The defendant responded to the filing of the original Complaint by filing both a Motion to Dismiss the sexual harassment claim and a Motion to Compel Arbitration of the ADA claims. The plaintiff filed the FAC and a notice indicating her belief that both of the defendant's motions were

---

[5] The Charge attached to the original Complaint does not reference a claim for sexual harassment or contain any factual allegations that could be construed as giving rise to any type of sexual harassment claim. According to the defendant, the plaintiff filed an Amended Charge (*see* Doc. No. 27 at 2 n.1), but neither party filed the Amended Charge with the pleadings or in connection with the pending motions. The court presumes, based on the defendant's decision not to seek dismissal of the sexual harassment claim altogether for failure to exhaust, that the Amended Charge incorporates a sexual harassment claim based on a hostile work environment. However, as discussed below, the defendant asserts in a footnote in its Memorandum in support of the Second Motion to Dismiss that the plaintiff failed to exhaust any sexual harassment claim premised on allegations that her termination was in *quid pro quo* or retaliation for refusing sexual overtures, as distinct from her hostile work environment theory of recovery. (*See* Doc. No. 22 at 3 n.1.)

rendered moot by the filing of the amended pleading. After being notified by the court that only the original Motion to Dismiss was mooted, the defendant filed the Second Motion to Dismiss, supporting Memorandum of Law, and a Supplemental Memorandum in support of its Motion to Compel Arbitration. (Doc. Nos. 21, 22, 23.) The plaintiff filed Responses in opposition to both motions (Doc. Nos. 24, 25), and the defendant filed Reply briefs in further support of both motions (Doc. Nos. 26, 27).

### C.      Sexual Harassment Claims Under Title VII

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's . . . sex," among other protected characteristics. 42 U.S.C. 2000e-2(a)(1); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). This prohibition "includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris*, 510 U.S. at 21 (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). Under this prohibition, courts broadly recognize two types of sexual harassment claims: (1) a claim of harassment that creates an offensive or hostile environment, also known as a hostile work environment claim; and (2) *quid pro quo* harassment, in which a supervisor demands sexual favors as a condition for job benefits. *Kauffman v. Allied Signal, Inc., Autolite Div.*, 970 F.2d 178, 182 (6th Cir. 1992); *Brown v. RCO Eng'g Inc.*, No. 23-11371, 2024 WL 1019258, at *5 (E.D. Mich. Mar. 8, 2024).[6] In addition, Title VII creates a cause of action for retaliation for

---

[6] The Sixth Circuit has on occasion suggested that *quid pro quo* sexual harassment is no longer approved terminology and, instead, that the two types of sexual harassment claims are (1) a claim of harassment that results in a hostile work environment but does not result in a tangible employment action and (2) a claim that does not necessarily allege severe or pervasive harassment but does result in a tangible employment action. *See, e.g., Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461, 461 n.4 (6th Cir. 2000) (characterizing claims "where the harassment is not severe or pervasive" as claims that "used to be referred to as *quid pro quo* sexual harassment"). The Sixth Circuit, however, has continued to use the term "*quid pro quo*" as effective short-hand for claims that involve a tangible employment action. *See, e.g., Huang v. Ohio State Univ.*, 116 F.4th 541, 560 (6th Cir. 2024) (defining the elements of a *quid pro quo* sexual harassment claim as including

opposing illegal conduct, and the Sixth Circuit has held that opposing sexual harassment qualifies as protected activity for purposes of a retaliation claim. *See E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015) ("If an employee demands that his/her supervisor stop engaging in this unlawful practice—*i.e.*, resists or confronts the supervisor's unlawful harassment—the opposition clause's broad language confers protection to this conduct."). "[T]he label affixed to the claim is not dispositive; instead; the [court's] focus should be on the substance of the plaintiff's allegations." *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 628–29 (6th Cir. 2013)

The FAC purports to set forth only one claim of "Sexual Harassment and Hostile Work Environment," under which the plaintiff states that "she was consistently subject to unwelcome verbal conduct of a sexual nature" by Pinson and that his conduct was "aggressive enough to create a hostile work environment." (FAC ¶¶ 396, 399.) Consequently, it appears that the plaintiff intended to state a hostile work environment claim. However, she might also have intended to state a *quid pro quo* harassment claim, or perhaps a retaliation claim, insofar as the plaintiff alleges that Pinson's sexual harassment "resulted in [her] termination" and that he was the "driving force behind her termination because he initiated conversations with [Ponder] about terminating Ms. Bruce after she stopped acquiescing to his inappropriate requests and behaviors." (FAC ¶¶ 407–08.) Regarding the plaintiff's claim that the harassment "resulted in [her] termination," A&R states, in a footnote, that, "[t]o the extent Bruce argues that she is making sex-based claims other than a hostile work environment claim, such claims must also be dismissed both because she did not make such claims in her EEOC charges and because she has failed to allege any of the elements

---

a showing that submission to unwelcomed advances was an express or implied condition for receiving job benefits *or* that the refusal to submit to those advances caused the harasser to take adverse employment action against her (citing *Bowman*, 220 F.3d at 461)). Because the defendant uses the term in this case, and the plaintiff imposes no objection, the court also uses it.

of such claims." (Doc. No. 22 at 3 n.1 (citing Doc. No. 1-1).)

A&R affirmatively seeks dismissal of the hostile work environment claim on the basis that Bruce fails to allege harassment that was sufficiently severe to alter the terms or conditions of her employment or create an abusive working environment and fails to show that the alleged conduct was unwelcome. It also asserts that the allegations in the FAC establish that A&R will be able to establish an affirmative defense based on the rulings in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (the "*Faragher/Ellerth* defense"). In another footnote, it asserts that the plaintiff's allegations that Pinson wanted her to be fired "cannot be used to support a hostile work environment claim, as claims for discrete acts of discrimination such as termination cannot be used to support a hostile work environment claim." (Doc. No. 22 at 7 n.4 (citing *Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833, 840 (6th Cir. 2024)).)

The plaintiff's Response directly addresses the defendant's claims in support of the dismissal of her hostile work environment claim. Regarding the defendant's footnoted arguments, she states only, "To the extent that Adams and Reese was attempting to broach additional issues in footnotes, Plaintiff would seek an opportunity to respond to those issues in a separate brief should the Court require it." (Doc. No. 24 at 1–2.) However, she also argues that the defendant cannot support a *Faragher/Ellerth* defense because the harassment "culminated in a tangible employment action"—her termination—and she has adequately alleged that Pinson retaliated against her by being the "driving force behind the employment action." (Doc. No. 24 at 4.)

The defendant devotes two-thirds of its Reply to arguing that the plaintiff failed to adequately exhaust or plead a *quid pro quo* harassment claim and then briefly reiterates its arguments in support of dismissal of the hostile work environment claim.

### 1.  Quid Pro Quo Sexual Harassment

While it is generally true that "substantive arguments are best not left to footnotes," *Bright v. Brookdale Senior Living, Inc.*, No. 3:19-CV-00374, 2021 WL 6496799, at *16 n.6 (M.D. Tenn. Mar. 12, 2021) (Campbell, J.), the court understands the point of the defendant's footnote to be that A&R does not actually construe the FAC as asserting such a *quid pro quo* claim, based on the fact that neither the plaintiff's Amended Charge nor the FAC actually sets forth the elements of such a claim. The plaintiff did not address the footnoted assertion other than to state that, "[t]o the extent that Adams and Reese was attempting to broach additional issues in footnotes, Plaintiff would seek an opportunity to respond to those issues in a separate brief should the Court require it." (Doc. No. 24 at 1–2.) The plaintiff does not clarify whether she did or did not intend to state a *quid pro quo* claim or whether she believes the FAC adequately articulates such a claim.[7]

For purposes of clarity, the court nonetheless feels compelled to address the question of whether the FAC actually does, or was intended to, state a claim for *quid pro quo* sexual harassment.[8] *Quid pro quo* sexual harassment requires a showing of a tangible employment action. To state a colorable *quid pro quo* claim, Bruce would need to allege facts that, if true, would establish that:

---

[7] The court will not address the defendant's footnoted exhaustion argument, because exhaustion is an affirmative defense that the defendants bears the burden of both pleading and proving. *Moore v. Coca-Cola Bottling Co. Consol.*, 113 F.4th 608, 622 (6th Cir. 2024). While a defense based on exhaustion may be "susceptible to resolution on a motion to dismiss if a plaintiff affirmatively pleads himself out of court," the plaintiff had no obligation to respond to A&R's motion "with affirmative matter raising a triable issue of fact on an affirmative defense." *Rembisz v. Lew*, 590 F. App'x 501, 504 (6th Cir. 2014) (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007)). The plaintiff did not respond to the footnoted exhaustion issue, and the defendant, though it arguably could have, did not produce for the court the plaintiff's Amended Charge.

[8] The court does not require additional briefing from the plaintiff to address this issue.

> (1) [she] was a member of a protected class; (2) [Pinson] subjected her to unwanted sexual advances; (3) these unwanted advances were because of her sex; (4) "submission to the unwelcomed advances was an express or implied condition for receiving job benefits," or that [Bruce's] refusal to submit to those advances caused [Pinson] to take adverse employment action against her; and (5) [A&R] is vicariously liable for [Pinson's] actions.

*Huang v. Ohio State Univ.*, 116 F.4th 541, 560 (6th Cir. 2024) (citing *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461, 461 n.5 (6th Cir. 2000)). In this case, the plaintiff does not allege that Pinson made *any* "sexual advances" after the move to A&R. Instead, she alleges that he made inappropriate sexual comments and jokes to and about her. (*See* FAC ¶¶ 335, 356–62.) The plaintiff does not allege any facts suggesting that any of these comments constituted unwelcome advances or that her submission to them was an express or implied condition of her receipt of any job benefit.

The last alleged incident that could arguably be characterized as a sexual advance occurred on February 2, 2022—before the move to A&R—when Pinson texted Bruce happy birthday after midnight and, when she responded immediately, asked her if she wanted him to come over. She said no. In other words, she did not submit to that unwelcome advance. Nor, however, can she establish that there is a causal connection between that event and her termination from A&R more than a year later. Three months after the proposition, Bruce moved to A&R (at Pinson's request). Another five months passed (during which the plaintiff alleges she rarely interacted with Pinson) before Pinson allegedly complained to Ponder about not being able to reach Bruce on September 30, 2022, which the plaintiff learned about on October 2, 2022. After that incident, although the plaintiff alleges that Pinson's inappropriate comments continued, the next apparent adverse employment event did not occur until March 2023—and it occurred because of Ms. Ponder, as the

plaintiff alleges in connection with her disability claim. (*See* FAC ¶¶ 62–97.)[9] In the absence of any additional evidence tying them together, the fact that more than eight months ensued between Pinson's February 2, 2022 proposition and his September 30, 2022 complaint eliminates the possibility of drawing a causal connection between them.

The FAC, in short, does not expressly state a *quid pro quo* claim; nor does it allege facts from which the court might infer the intention to state a *quid pro quo* claim. The defendant does not expressly move to dismiss such a claim; the plaintiff does not expressly seek to defend the existence of such a claim. Under these circumstances, the court finds that the FAC does not state a claim based on *quid pro quo* sexual harassment and, moreover, that the plaintiff did not intend to state such a claim.

### 2.    *Hostile Work Environment Claim*

"[D]iscrimination based on sex" that "create[s] a hostile or abusive work environment" is actionable under Title VII. *Meritor*, 477 U.S. at 66. "In the case of a harassing supervisor, the employer is vicariously liable for the hostile work environment." *Doe v. City of Detroit*, 3 F.4th 294, 301 (6th Cir. 2021).

At the motion-to-dismiss stage, a plaintiff is not required to plead facts establishing a *prima facie* case, as would be required at the summary judgment stage under *McDonnell Douglas v.*

---

[9] In this part of the FAC, the plaintiff exhaustively details one of the events giving rise to her ADA claims. For purposes of the present Motion to Dismiss, it suffices to point out that the plaintiff does not allege any events that took place from November 8, 2022, when she began including Ponder on her communications about being late to work, until March 13, 2023, when she began to oversleep as a result of her medications and, after arriving late to work nine days over the course of two weeks, had an unscheduled meeting with Ponder, Cheek and Pinson on March 24, 2023. (FAC ¶¶ 60–65.) The plaintiff alleges that, during this meeting, Ponder was aggressive and confrontational, told the plaintiff she deserved to be fired, berated the plaintiff when she requested an accommodation, and caused the plaintiff to experience a panic attack. (*Id.* ¶¶ 70–88, 91–96.) Bruce also alleges that Pinson and Cheek voiced their support for her and her work product during this meeting and that Cheek apologized to her for Ponder's actions. (*Id.* ¶¶ 89–90, 97–99.)

*Green*, 411 U.S. 792 (1973). *See Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833, 839 (6th Cir.), *cert. denied*, 144 S. Ct. 2689 (2024). "Instead, a plaintiff asserting a hostile work environment claim must allege that her 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)). The alleged harassment must be both objectively and subjectively severe and pervasive to be actionable. *Id.* at 841 (citation omitted). The plaintiff must also allege that she is a member of a protected class and that "the harassment was based on [sex]." *Id.* at 839 (quoting *Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017)). The plaintiff, however, is not required to allege "specific facts beyond those necessary to state [her] claim." *Kinney v. McDonough*, No. 21-1414, 2022 WL 223633, at *6 (6th Cir. Jan. 26, 2022) (citation omitted).

In addition, "allegations of discrete acts of discrimination [sh]ould not be characterized as part of the hostile work environment claim." *Ogbonna-McGruder*, 91 F.4th at 840. This is because, "under Title VII, a plaintiff may bring a claim alleging that either (1) an employer engaged in 'discrete discriminatory acts' such as 'termination, failure to promote, denial of transfer, or refusal to hire'; or (2) the employer's 'repeated conduct' created a hostile work environment." *Id.* (quoting *Morgan*, 536 U.S. at 114–15). Thus, the Sixth Circuit has "consistently held that allegations of discrete acts may be alleged as separate claims, and as such 'cannot properly be characterized as part of a continuing hostile work environment.'" *Id.* (quoting *Sasse v. U.S. Dep't of Labor*, 409 F.3d 773, 783 (6th Cir. 2005)).

Setting aside the alleged events that occurred before the plaintiff began working for A&R and that cannot, as a result, be attributed to A&R, the plaintiff alleges, as set forth above, that

Pinson was rarely in the office after they transitioned to A&R, that she "went out of her way to avoid him" because his comments made her increasingly uncomfortable, and that, by the fall of 2022, she "hardly spoke to him." (FAC ¶¶ 333–34, 336–37.) Despite the relative rarity of their contact, Pinson "continued" to sexually harass Bruce when he was in the office. This harassment consisted of sexual comments to and about her and inappropriate comments about her appearance, clothing, and private life, including inappropriate comments related to her engagement and relationship with her fiancé. Bruce provides three examples of inappropriate comments: (1) Pinson's saying, "Let's have Randi [Bruce] go down there in a short skirt"; (2) his saying "Hoe no" instead of "Oh no" when talking to her; and (3) his making a comment on April 19, 2023 "about how 'hot' it would be to see Bruce and another paralegal engaging in sexual acts on his desk." (*Id.* ¶¶ 360–62.)

The defendant argues that these allegations, even if accepted as true, do not show that the alleged harassment was sufficiently severe or pervasive to "alter the conditions of [Bruce's] employment and create an abusive working environment." *Harris*, 510 U.S. at 21. In responding to this argument, the plaintiff points to her allegations of "almost four years of harassment that culminated in her termination" and contends that the "continuous nature of the harassment is enough" to permit the court to find that Pinson's actions were "hostile." (Doc. No. 24 at 3.) She also points out that she and Pinson worked together at A&R for almost a year and that she alleges that the unwanted comments continued until her termination. (*Id.*) She asserts that Pinson "retaliated against her by working with Brooke Ponder to put her under increased scrutiny and have her fired." (*Id.*)

Although the case presents an extremely close call, the court finds that the plaintiff has adequately pleaded a hostile work environment claim, for purposes of Rule 8 of the Federal Rules

of Civil Procedure and the standards articulated in *Twombly* and *Iqbal*. She is not required to allege every instance of harassing conduct, and the three examples of inappropriate comments are apparently intended to be just that: examples. She alleges that such comments were essentially continuous for the period of time she was employed by A&R, whenever she interacted with Pinson, continuing up until her termination. Although none of the conduct qualifies as severe, it was, at least as alleged in the FAC, pervasive.[10] When the facts are fleshed out through discovery, it may well be that the alleged conduct was neither objectively nor subjectively sufficiently pervasive to create a hostile working environment. For now, however, viewing the facts in the light most favorable to the plaintiff and drawing all reasonable inferences in her favor, the court finds that the FAC very marginally alleges that Pinson's "'repeated conduct' created a hostile work environment." *Ogbonna-McGruder*, 91 F.4th at 840.[11]

As for the defendant's argument that the plaintiff has failed to allege that the conduct was "unwelcome," the court is not persuaded. First, as previously noted, Bruce does not need to plead every element of a *prima facie* case at this juncture. And second, she has, in fact, adequately alleged that the conduct was unwelcome and that Pinson knew it was unwelcome. The comments

---

[10] Insofar as the plaintiff continues to rely on events that occurred while she was still employed at a different law firm, before moving to A&R, in support of her hostile work environment claim, she provides no basis for attributing Pinson's conduct during that time period to A&R. While the court finds that the allegations regarding what happened after she began working at A&R are sufficient to establish her claim, at this juncture, the plaintiff is on notice that, to prove her claim, she will likely not be able to rely on events that predated the move, for purposes of A&R's liability.

[11] The absence of more detailed allegations in the FAC of the allegedly harassing conduct that occurred between May 2022 and May 2023 certainly suggests that the plaintiff lacks additional evidence, particularly given the highly detailed nature of the allegations covering the allegedly harassing conduct that took place between July 26, 2019 and March 31, 2020 and between May 25, 2021 and February 2, 2022 (all when the plaintiff was not employed by A&R), and given the details set forth in the FAC concerning the defendant's alleged conduct giving rise to the plaintiff's ADA claims that took place between October 2, 2022 and May 12, 2023. Again, however, in the context of a motion to dismiss, the court must draw reasonable inferences in the plaintiff's favor.

she attributes to Pinson are sufficiently offensive that any reasonable person—and certainly any reasonable attorney—would have known that they were inappropriate and unwelcome.

The FAC, in sum, adequately alleges a hostile work environment claim based on Pinson's repeated and continuous sex-based inappropriate comments and jokes.

### 3. The Faragher/Ellerth Defense

That conclusion requires the court to consider the defendant's next argument: that the plaintiff cannot overcome its *Faragher/Ellerth* defense. Generally, when a "supervisor," as opposed to a co-worker, engages in sexual harassment, an employer may be strictly liable for that conduct *if* it "culminates in a tangible employment action." *Wyatt v. Nissan N. Am.*, 999 F.3d 400, 412 (6th Cir. 2021). However, "if the harassment does not result in a tangible employment action, 'the employer may escape liability by establishing' an affirmative defense under the *Faragher-Ellerth* framework." *Id.* (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013), and citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)). To avail itself of the affirmative defense, the employer must show by a preponderance of the evidence that (1) it "exercised reasonable care to prevent and correct any harassing behavior" and (2) that Bruce "unreasonably failed to take advantage of the preventive or corrective opportunities" that A&R provided. *Id.* at 414 (quoting *Vance*, 570 U.S. at 424); *see also Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 348 (6th Cir. 2005). The defendant must prove both prongs to prevail on its affirmative defense. *Wyatt*, 999 F.3d at 414.

At least for purposes of its Motion to Dismiss, A&R accepts that the plaintiff plausibly alleges that Pinson was a supervisor. It argues, however, that Bruce has otherwise "failed to plead facts to show her claim could go forward in the face of" its *Faragher/Ellerth* defense. (Doc. No. 22 at 10; *see id.* at 5 (asserting that the FAC "fail[s] to address the glaring problem with her hostile work environment claim—Bruce's admission that she knew how to complain about sexual

harassment but chose not to do so").)

Notably, the *Faragher/Ellerth* defense is a *defense* that the defendant must plead and prove. The plaintiff has no obligation to plead facts to avoid it. A&R argues, however, that the allegations in the FAC itself establish that the hostile work environment claim will be barred by the defense. (*Id.* at 11.) Specifically, it points out that Bruce alleges that she received a handbook when she went to work for A&R, that the handbook contained provisions prohibiting harassment and providing employees multiple avenues for reporting harassment, and that the plaintiff showed she knew how to use these procedures, because she did so when she requested a reasonable accommodation for her disability. (*See id* (citing FAC ¶¶ 137, 143).) A&R also argues that the FAC shows that the plaintiff never complained to anyone at A&R that she was being sexually harassed. A&R's position is that this is all that is required to show that it is entitled to assert the *Faragher/Ellerth* defense.

In Response, the plaintiff asserts that Pinson, the harasser, was a supervisor and a partner at the law firm and, therefore, that he knew about the harassment. The implication of this assertion is that, because Pinson was a supervisor, his knowledge can be imputed to A&R. Bruce also asserts that the harassment "culminated in a tangible employment action" (her termination) and that Pinson was the "driving force" behind that action, which makes the *Faragher/Ellerth* defense unavailable to A&R. (Doc. No. 24 at 4.) Specifically, she claims that:

> Pinson discussed terminating Plaintiff with office manager Brooke Ponder, on September 30, 2022. It was not until after this discussion that Adams and Reese began reprimanding Plaintiff for her attendance and punctuality. Given the amount of control Pinson had over Plaintiff's work, his leadership role within the law firm, and the fact that his actions resulted in Plaintiff being terminated from her position, Adams and Reese cannot use the affirmative defense to protect itself.

(Doc. No. 24 at 5 (citing FAC 36–37).) Her position, in other words, is that the FAC adequately alleges that Pinson, in addition to harassing her, "began retaliating against [her] at [A&R]." (*Id.* at

1, 3.)

Despite the failure of either party to adequately brief this issue, the court finds that the FAC cannot be construed to assert a Title VII retaliation claim and that, to the extent the plaintiff intended to assert such a claim, the attempt failed. To state a claim for retaliation, Bruce must plausibly allege that she engaged in protected conduct, that she was subjected to an adverse action taken by the employer, and that there was a causal link between the adverse action and the protected conduct. *O'Connor v. Lampo Grp., LLC*, No. 3:20-CV-00628, 2021 WL 4480482, at *9 (M.D. Tenn. Sept. 29, 2021) (citing *Hazel v. Quinn*, 933 F. Supp. 2d 884, 886–87 (E.D. Mich. 2013)).[12]

Here, as discussed above, the only protected conduct in which Bruce allegedly engaged was declining Pinson's invitations to social events in 2019 and 2021 and then, very particularly, saying "no" to a sexual proposition on February 2, 2022, all while she was not yet employed by A&R. Bruce also allegedly told Will Cheek about the event in February 2022—again, before they moved to A&R. The plaintiff does not allege any continued invitations or propositions by Pinson after they moved to A&R, only inappropriate comments and jokes. She does not allege that she complained to anyone, including Pinson or Cheek, about those post-move comments and jokes. In other words, for purposes of a retaliation claim, Bruce fails to allege that she engaged in any protected conduct once she moved to A&R. Absent protected conduct, her retaliation claim fails.

Moreover, to the extent that saying "no" to Pinson's February 2, 2022 proposition may qualify as protected conduct even though the plaintiff was not yet employed by A&R at that time, as already discussed above, the period of time between that sexual proposition and Pinson's

---

[12] To be clear, these are the elements of a retaliation claim, not the elements of the plaintiff's *prima facie* case for purposes of the *McDonnell Douglas* test. *Accord O'Connor*, 2021 WL 4480482, at *9 n.15.

allegedly retaliatory complaint on September 30, 2022 is simply too attenuated, standing alone, to give rise to any possible inference of a causal connection between them—much less a causal connection to Bruce's termination (for other reasons) in May 2023. *Accord Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 615 (6th Cir. 2019) (recognizing that "temporal proximity [between a Title VII complaint and an adverse employment action] alone can be enough circumstantial evidence of causation if the two are sufficiently close in time," but that, "[w]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality" (internal quotation marks and citations omitted)). Because the FAC contains *no* other evidence of retaliatory conduct that would support a causal connection between allegedly protected conduct on February 2, 2022 and an adverse action on September 30, 2022, the plaintiff fails to state a retaliation claim and, for purposes of the *Faragher/Ellerth* defense, fails to allege facts that, if true, would permit a reasonable jury to conclude that the alleged sexual harassment culminated in a tangible employment action. The defendant, therefore, is not barred from raising the defense.

However (and despite the plaintiff's failure to posit other reasons to reject the application of the defense here), the court finds that the defendant has not carried its burden of proving both prongs of the defense by simply pointing to Bruce's admission that A&R had an employee handbook and her apparent understanding of how to invoke her rights in connection with her request for an accommodation for a disability. Under the first *Faragher/Ellerth* prong, "regardless of whether the victimized employee actively complained, . . . an employer will not escape vicarious liability if it was aware of the harassment but did nothing to correct it or prevent it from occurring in the future." *Clark*, 400 F.3d at 349. In addition, the Sixth Circuit has explained that,

> [w]hile the affirmative duty on the part of the employer will often include the requirement that it have some sort of sexual harassment policy in place, the duty does not end there. Prong one of the affirmative defense requires an inquiry that looks behind the face of a policy to determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior.

*Id.* (citing *Faragher*, 524 U.S. at 806). To be "effective," the employer's sexual harassment policy should, at a minimum, "(1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) and provide for training regarding the policy." *Id.* at 349–50 (internal citations omitted). And a court, in evaluating whether the defendant took reasonable care in preventing and promptly correcting the alleged sexual harassment, "must look not only to [the defendant's] sexual harassment policy, . . . but also to its implementation of that policy." *Id.* at 349.

The defendant clearly has not established all of these elements and certainly cannot do so based solely on the face of the FAC. And even if it could, with regard to the second prong, the allegations in the FAC do not affirmatively show that the plaintiff's failure to take advantage of A&R's remedial procedures was unreasonable. The plaintiff expressly alleges that, because Pinson was her supervisor, she was "convinced that complaining about her situation to Adams and Reese Human Resources would lead to negative results and additional retaliation" and that she "felt like she had no choice" but to accept Pinson's alleged harassment in order to keep her job. (FAC ¶¶ 354–55.) Only an examination of all of the facts and circumstances of this case will reveal whether that conclusion was reasonable.

In sum, the court finds that the plaintiff has adequately, though marginally, alleged a hostile work environment claim, but she has not alleged facts showing that she suffered a tangible employment action resulting from the harassment. The defendant, therefore, is not barred from raising a *Faragher/Ellerth* defense, but it also has not established at this juncture that it is entitled

to dismissal of the hostile work environment claim based on that defense. The defendant's Second Motion to Dismiss will be denied, insofar as it seeks dismissal of the plaintiff's hostile work environment claim. As set forth above, however, the court does not construe the FAC as asserting a *quid pro quo* sexual harassment claim; nor does the FAC allege facts supporting a retaliation claim. To the extent the plaintiff intended to assert a Title VII retaliation claim, that claim will be dismissed.[13]

## II.    MOTION TO COMPEL ARBITRATION

Having determined that the Second Motion to Dismiss will be denied, the court must determine whether the plaintiff's claims under the ADA should be referred to arbitration or whether the entirety of the case will remain in this court.

Generally, deciding whether to grant a motion to compel arbitration requires the court to make four distinct determinations:

> [F]irst, [the court] must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

*Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 451 (6th Cir. 2005). The plaintiff does not dispute that she and A&R agreed to arbitrate and that the Arbitration Agreement covers her ADA claims. She argues, however, that, with the passage of the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021, none of her claims in this case are referrable to arbitration. A&R responds that, although the court must maintain jurisdiction of the sexual harassment claims, it

---

[13] Because neither the court nor the parties construe the FAC as intending to assert a *quid pro quo* claim, and the defendant does not actually move to dismiss such a claim, the court does not find it necessary to dismiss that non-existent claim.

should refer the ADA claims to arbitration.

The Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (the "EFAA") was enacted and went into effect in March 2022 as a direct amendment of the Federal Arbitration Act ("FAA"). It provides, in relevant part:

> Notwithstanding any other provision of this title, at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, . . . no predispute arbitration agreement . . . shall be valid or enforceable *with respect to a case* which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute.

9 U.S.C. § 402(a) (emphasis added). In other words, the EFAA was enacted in order to allow individuals alleging sexual assault or sexual harassment to forgo arbitration at their election. *See Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 560 (S.D.N.Y. 2023). The EFAA explicitly refers the question of applicability to "a court, rather than an arbitrator, . . . irrespective of whether the agreement purports to delegate such determinations to an arbitrator." 9 U.S.C. § 402(b); *Johnson*, 657 F. Supp. 3d at 550.

The issue raised here is this: given the EFAA's use of the term "case," if a single case includes claims of sexual harassment (or sexual assault) and other kinds of claims, as here, does the EFAA preclude enforcement of an otherwise applicable and enforceable arbitration agreement as to the whole case or just the sexual harassment/assault claims. "Because the EFAA is so new, there are few decisions interpreting it." *Williams v. Mastronardi Produce, Ltd.*, No. 23-13302, 2024 WL 3908718, at *6 (E.D. Mich. Aug. 22, 2024). Although there are apparently no circuit court opinions addressing the EFAA yet, the issue in dispute in this case has been raised and addressed by several district courts. *See id.* The plaintiff contends that the EFAA applies to the whole case and that the court must deny the Motion to Compel Arbitration; the defendant concedes that the court cannot compel the court to arbitrate Bruce's sexual harassment claim, but it contends that the court must compel the plaintiff to arbitrate her other claims.

By a large majority, the district courts interpreting the EFAA so far (including at least two within the Sixth Circuit) have concluded, based upon the statute's use of the term "case," that the EFAA precludes arbitration of the entire case, so long as the complaint includes a plausible sexual harassment/assault claim. *See, e.g.*, *Williams*, 2024 WL 3908718, at *7 (following the majority); *Scoggins v. Menard, Inc.*, No. 2:24-CV-00377, 2024 WL 3860464, at *7 (S.D. Ohio Aug. 19, 2024) (recognizing that, "[t]raditionally, in the context of the FAA, 'if a dispute presents multiple claims, some arbitrable and some not, the former must be sent to arbitration even if this will lead to piecemeal litigation'" (quoting *KPMG LLP v. Cocchi*, 565 U.S. 18, 19 (2011), but holding that "the EFAA did away with this presumption by directly amending the FAA" and that the unambiguous language of the EFAA renders a pre-dispute arbitration agreement invalid and unenforceable "with respect to a *case* . . . relat[ing] to the . . . sexual harassment dispute" and "thus does not limit the invalidation to the claim or claims in which that dispute plays a part"); *see also Clay v. FGO Logistics, Inc.*, No. 3:23-CV-01575-MPS, 2024 WL 4335791, at *12 (D. Conn. Sept. 27, 2024) ("When a covered 'dispute' or 'claim' arises or accrues after [the effective date of the EFAA], any arbitration agreement that would otherwise govern that dispute or claim may be invalidated with respect to all claims in the case by the person alleging the covered dispute or claim."); *Molchanoff v. SOLV Energy, LLC*, No. 23-cv-653, 2024 WL 899384, at *5 (S.D. Cal. Mar. 1, 2024) (concluding that "the EFAA bar[red] enforcement of the arbitration agreement . . . as to all claims in th[e] case, and as to all Defendants"); *Johnson*, 657 F. Supp. 3d at 558–61 (holding that, when a case presents multiple claims—some related to sexual harassment and others not—the EFAA blocks arbitration of the entire case, not just the sexual harassment claims); *Delo v. Paul Taylor Dance Found., Inc.*, 685 F. Supp. 3d 173, 180–81 (S.D.N.Y. 2023) (same, agreeing with *Johnson*).

On the other hand, a very small minority of cases have held that, when a litigant files a case with multiple claims, the EFAA invalidates the otherwise enforceable arbitration agreement only as to the claims that are closely related to, or intertwined with, the sexual assault or sexual harassment dispute. *See, e.g.*, *Mera v. SA Hospitality Grp., LLC*, 675 F. Supp. 3d 442, 447 (S.D.N.Y. 2023) (holding that, "under the EFAA, an arbitration agreement executed by an individual alleging conduct constituting a sexual harassment dispute is unenforceable only to the extent that the case filed by such individual 'relates to' the sexual harassment dispute"—that is, "only with respect to the claims in the case that relate to the sexual harassment dispute," and that "[t]o hold otherwise would permit a plaintiff to elude a binding arbitration agreement with respect to wholly unrelated claims affecting a broad group of individuals having nothing to do with the particular sexual harassment affecting the plaintiff alone"); *Turner v. Tesla, Inc.*, 686 F. Supp. 3d 917, 925–28 (N.D. Cal. 2023) (purporting to reject *Mera* and to agree with *Johnson* but conducting a close analysis of each of the plaintiff's claims and finding that they were not referrable to arbitration because they were either intertwined with or "substantially related to" her sexual harassment claims).

This court agrees with those courts expressly rejecting *Mera* as imposing an unmanageable standard. As explained in another opinion issued from the same judicial district as *Mera*:

> [*Mera*'s] interpretation would require courts to carve up every case to which the EFAA applies by reaching judgment—with respect to each claim—on whether the claim relates to the sexual harassment or sexual assault dispute. But that approach not only is antithetical to the language of the EFAA and its protective intent, but it would also have the court address early in a case and in a definitive manner a question that often is not easily answered on the pleadings. It is not self-evident for example, that evidence that the plaintiff was the victim of persistent sexual assault or harassment would be irrelevant to the claim that such person had also been deprived of her rights to a minimum wage and overtime pay.

*Diaz-Roa v. Hermes L., P.C.*, No. 24-CV-2105 (LJL), 2024 WL 4866450, at *13 n.9 (S.D.N.Y. Nov. 21, 2024) (internal quotation marks and citations omitted). This court, following the clear

majority of opinions on this issue, finds, based on the unambiguous statutory language, that, because the plaintiff states a colorable sexual harassment claim, the Arbitration Agreement is unenforceable as to the entire case.

Accordingly, the Motion to Compel Arbitration will be denied.

## III.     CONCLUSION

For the reasons explained herein, the defendant's Second Motion to Dismiss (Doc. No. 21) will be granted in part, insofar as it apparently seeks dismissal of an arguable effort to state a retaliation claim under Title VII. The motion will be denied as the plaintiff's hostile work environment claim. The defendant's Motion to Compel Arbitration (Doc. No. 13) will also be denied. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge